UNITED STATES v. BOYD et al.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1897.)

No. 229.

1. INDIANS—CITIZENSHIP—EASTERN CHEROKEES.

The Eastern Band of Cherokee Indians did not, by virtue of the treaty of New Echota, become citizens of North Carolina and of the United States, but are wards of the nation.

2. SAME.

The act of February 8, 1887 (24 Stat. 388, § 6), declaring certain Indians to be citizens, has no application to a tribe of Indians.

3. SAME.

The political departments of the government have recognized the Eastern Band of Cherokee Indians as constituting a tribe; at least, as that word is used in the United States constitution.

4. COURTS—FOLLOWING EXECUTIVE ACTION.

It is a rule of the courts to follow the action of the executive and the departments in matters which it is the duty of the latter to determine.

5. SAME—CONSTITUTIONAL LAW.

Neither the constitution of a state nor an act of its legislature can prevent the application of an act of congress to the Indian tribes residing in the states, but subject to the control of the general government.

6. SAME—SALE OF TIMBER BY INDIANS—APPROVAL BY INTERIOR DEPARTMENT.

In the absence of fraud on the part of those representing the department of the interior, its refusal to sanction negotiations by the Eastern Band of Cherokee Indians for the sale of their standing timber is conclusive of the matter.

7. SAME—PROTECTION OF INDIANS.

It is both the right and the duty of the United States to institute such proceedings as will fully protect the interest and property rights of its Indian wards.

Appeal from the Circuit Court of the United States for the Western District of North Carolina.

R. B. Glenn, U. S. Atty.

Louis M. Bourne, George H. Smathers, and W. T. Crawford, for appellees.

Before GOFF, Circuit Judge, and HUGHES and BRAWLEY, District Judges.

GOFF, Circuit Judge. This is a suit in equity, filed in the circuit court of the United States for the Western district of North Carolina, against D. L. Boyd, Harry Dickson, W. T. Mason, and the Eastern Band of Cherokee Indians; the complainants being the United States of America, Sampson Owl, Lewis H. Smith, Comeback Wolf, and all other of the Cherokee Indians who may choose to come in and make themselves party plaintiffs. It is set forth in the bill that one William H. Thomas and wife, for value received, and as directed by a decree of the United States circuit court for the Western district of North Carolina, conveyed by deed, in fee simple, to the Eastern Band of Cherokee Indians, a large tract of land, containing many thousand acres, situated in the state of North Carolina, and known as the "Qualla Boundary"; that subsequent to the execution of said deed the Eastern Band of Cherokee Indians entered into the possession of said lands, which were necessary to their support and maintenance; that in said deed was inserted the following clause, to wit: "to have and to hold the above-described premises, with the appurtenances thereunto belonging, unto the said Eastern Band of North Carolina Cherokee Indians, their heirs and successors, forever, but without power of alienation, except by and with the assent of their council, and the approval of the president of the United States"; that, after said band of Indians had so entered into the possession of the land described, some of them, with the approval and assent of their council, entered into a contract with the defendant D. L. Boyd, by which all the timber in

and upon a part of said land, containing about 33,000 acres, known as the "Cathcart Tract," was sold to him for the sum of $15,000, payable in three installments of $5,000 each; that immediately after the execution of such contract of sale said Boyd made a subcontract with the defendants Dickson and Mason, and that they took possession of the land with a large force of men, who commenced to cut and destroy said timber, and to make arrangements to ship the same to market; that many of the Indians of the Cherokee Band, among whom are those joined as complainants with the United States, are opposed to said contract, and think it is not for the best interest of the band; that such contract of sale was never presented to the president of the United States for his assent, and has never been approved by him, but that the department of the interior, acting for the United States in its dealings with the Eastern Band of Cherokee Indians, has refused to ratify and approve such contract; that such contract to cut the timber from said land was forbidden by the terms of the deed from said Thomas and wife, unless the same was assented to and approved by the president of the United States, and that, as he has refused to ratify the same, it is absolutely void; and that, therefore, the action of the defendants in cutting, destroying, hauling, and removing said timber is unwarranted and without legal authority.    It is further alleged in the bill that by certain acts of the congress of the United States, and also by certain treaties heretofore made, as well as by the laws of the state of North Carolina, the Eastern Band of Cherokee Indians have been recognized as a tribe of Indians, under the control and government of the United States, to the same extent as the Indians on the reservations are governed; that by reason of such relation between said Indians and the United States the proper officers of the same have the right to control the action of said band, and to superintend all matters appertaining to their welfare, and to that end to reject the contract so made with Boyd as being contrary to the true interests of said Indians; that the complainants, under the law, and acting in the interest of said band of Indians, have the right to and do object to the waste being committed on said lands by the removal of said timber, and therefore they ask that the said defendants be restrained from doing so.    The complainants ask in their bill that the court will pass upon and construe all matters in relation to said Eastern Band of Cherokee Indians, including the right of their council to lease said lands and to sell the timber thereon, and also to say as to the right of the United States to control, manage, and superintend the affairs of said Indians, and what right, if any, the defendants have to cut and remove the timber from the said land.    The complainants claimed that the contract with Boyd was void, and that, unless the defendants were prohibited from cutting and selling the timber mentioned, a lasting and irreparable injury would be done the Eastern Band of Cherokee Indians, who are the wards of the United States. An injunction was prayed for, as also an accounting.    On the filing of the bill, which was duly sworn to, the court below, on the 20th day of February, 1895, entered an order requiring the defendants to appear on the second Monday in April, 1895, and show cause why they should not be restrained and perpetually enjoined from cutting and hauling

the timber from said land; and in the meantime their agents and servants were restrained from so cutting and hauling.

The Eastern Band of Cherokee Indians, acting by and through Stilwell Saunookee, principal chief; Will Talalah, vice chief; Andy Standingdeer, Wesley Standingdeer, Jesse Reed, Dawson George, Screamer, Sevier Armachame, Cocumma, Morgan Calhoun, Abraham Hill, and Climbing Bear, members of their council,—filed its answer to the bill on the 16th day of April, 1895. In said answer the allegation in the bill that William H. Thomas and wife conveyed the land known as the "Qualla Boundary" to the Eastern Band of Cherokee Indians is denied, and it is claimed that the same was conveyed by William Johnston and wife, in fee simple; but it is insisted that said deed was not executed in pursuance of the award therein referred to, which directed that the deed should be made by said William Johnston "to the Eastern Band of Cherokee Indians, or to some trustee for them," and hence it is claimed that the words found therein as follows, "but without the power of alienation, except by and with the assent of their council, and the approval of president of the United States," were unauthorized by the award referred to, and inconsistent with the tenure of a fee-simple estate, in that it created a perpetuity, which is forbidden by the constitution and laws of the state of North Carolina; and it is also set out in the answer that by a decree entered on the 15th day of October, 1894, in the two suits pending in the circuit court of the United States for the Western district of North Carolina, entitled, respectively, "Eastern Band of Cherokee Indians vs. William H. Thomas, William Johnston, et al.," and "The United States vs. William H. Thomas, William Johnston, et al.," it was adjudged that said words so inserted in the deed were unauthorized and void, and it was ordered that a new deed should be executed, omitting therefrom the words so found in the proviso mentioned. It is also claimed in the answer that the Eastern Band of Cherokees did not in fact enter into the possession of said land under and subsequent to the date of the Johnston deed, but that they and their ancestors had been living continuously on said Qualla boundary of land under a contract of purchase of the same made with William H. Thomas soon after the treaty of New Echota, between the United States and the Cherokee Nation, dated the 29th of December, 1835 (7 Stat. 478), and that title to said land is claimed by said Indians under that contract, the award made concerning the same, and the decree aforesaid entered in the said two chancery causes mentioned. It is admitted in the answer that the council of the Eastern Band of Cherokee Indians sold the timber on the Cathcart tract of the Qualla boundary of land to the defendant D. L. Boyd at the price of $15,000, and that he resold the same to his co-defendants, Mason and Dickson, and also that said timber was being cut and prepared for the market until the restraining order was issued in this case. It is also admitted in this answer that the contract with Boyd was not approved by the president of the United States, and also that the secretary of the interior refused to ratify the same; but it is claimed that it was not necessary to the validity of said contract that it should have either the approval of the president or the ratification of the secretary of the interior, and therefore

it was insisted that the cutting of said timber was not an act of trespass on the part of the defendants, but that it was lawfully done, as the sale so made by the council of the Eastern Band of Cherokee Indians to said Boyd was in all respects valid.

The further claim is made in said answer that the true status of the Indians mentioned was that they were citizens of the state of North Carolina, and that they have been such since soon after the said treaty of New Echota, and that as such citizens they were incorporated a body politic by the general assembly of North Carolina in the year 1889, and that by the decree mentioned as entered on the 15th day of October, 1894, the title to the Qualla boundary was vested in said Indians as a corporation; that the general assembly of North Carolina, at the session held on the 8th day of March, 1895, passed an act amending said act of incorporation of 1889, and confirming the said contract of sale made to Boyd; that the Eastern Band of Cherokee Indians, against whom this suit is brought, are those Indians, and their descendants, who, after the treaty of New Echota, remained in North Carolina, and became citizens of that state, by virtue of the eighth and twelfth articles of that treaty, and that they have since said treaty paid taxes on their real and personal property, and that they have voted at state and national elections, and that they have been subject to all the liabilities, and entitled to all the privileges and immunities, of other citizens of the state of North Carolina; that the council of said band of Indians, at different times from the year 1890 to the year 1893, made application to the interior department for permission to sell the timber on said land, but that authority so to do was refused; that the council so applied to the interior department for authority to sell such timber because the United States have for the past 12 or 15 years appropriated money to carry on the Cherokee training school, and the council did not wish to incur the displeasure of the commissioner of Indian affairs and the secretary of the interior, and hence it sought their co-operation in making said sale, and not because the council believed that the approval of the president or the consent of the secretary was necessary to a valid sale of said timber. The answer further states that, of the $15,000 to be paid by Boyd for the timber, the sum of $6,000 has been paid by him to said council, and that the remaining $9,000, with interest at 6 per cent. per annum, is still due and unpaid, but is secured by a lien on the trees sold, as is shown by said contract. Other matters not involved in this suit, and not essential to the decision of the questions to be disposed of, are mentioned in the answer, but we do not deem it necessary to refer to them now. The joint and several answer of the defendants Dickson and Mason was also filed, and likewise the answer of the Dickson-Mason Lumber Company, to which company defendants Dickson and Mason had sold and transferred their interest in the Boyd contract, and which said Dickson-Mason Lumber Company had also been made a defendant to the bill by order of court. These answers, except as to certain matters peculiar to the said separate respondents, make the same defense to the allegations of the bill as was made in the answer of the Eastern Band of Cherokee Indians, and the same will not be again set forth. No answer was filed by the defendant Boyd.

The court below, on February 11, 1896, appointed George H. Smathers receiver, with instructions to collect the unpaid purchase-money notes given for said timber, and to take such steps as might be necessary to protect the interest of the rightful owner in the timber that had been cut, but which had not been removed, and was liable to deterioration in value. The court also referred the cause to the standing master, with instructions that he inquire into all the facts connected with the contract in issue, and the circumstances under which it was made, the adequacy of the consideration therefor, and the existence of any fraud or unfair dealing therein. The master duly returned his report, together with the evidence taken before him, from which it appears that Boyd contracted for the timber on the 28th of September, 1893, agreeing to pay $15,000 for the same, and that he sold it to Mason and Dickson in December, 1893, for $25,000; that H. G. Ewart, by a contract with said Indians made in October, 1891, was to receive 20 per cent. of the amount realized from the sale of the timber, for services rendered by him in the negotiations preceding said sale; that, in the opinion of the witnesses examined, the sum of $15,000 was an adequate and fair price for the timber sold to Boyd. The master so reported, and also stated that there was no fraud or unfair dealing in the making of said contract. The court on the 11th day of February, 1896, entered an order granting said Ewart the right to intervene in this suit, which he did by petition, and the court by decree of that date dissolved the injunction and restraining order granted when the bill was filed, and authorized the parties to the contract relating to the timber to carry the same out pursuant to the terms thereof. The court below, also, on April 5, 1897, passed a decree directing the allowance of the claim of the petitioner H. G. Ewart, and that provision should be made for paying the same out of the funds to be realized from the sale of said timber.

From these decrees the United States appealed, claiming that the court below erred as follows: First. Because, while it held that the Eastern Band of Cherokees were wards of the nation, and subject to the control of the department of the interior, still it held that the contract of said Indians relating to the sale of the timber on their land was good and binding, unless fraud or undue influence in connection with the execution of the same was shown. The United States contend that, as said Indians are the wards of the nation, all contracts made by them are void, unless they are approved by the proper officials of the government. Second. It is claimed that the court erred in holding that the contract of said Indians with Ewart was binding and of force, as the same was without the approval of the department of the interior. Third. That, even if the contract with Ewart was a valid one, still the court erred in holding that he had complied with the same, and in directing that he be paid from the proceeds of said timber.

We fully agree with the insistence of the complainants below that the Eastern Band of Cherokee Indians are the wards of the nation, and that they have been treated as such since the year 1848 by the executive and legislative departments of the government; and in this connection we may remark that said Indians themselves have recog-

nized such relationship from said date down to the time during which the negotiations for the sale of the timber now in controversy were being carried on. Therefore we hold that the court below had jurisdiction of this suit, and that it was not only proper, but that it was the duty of the United States, to take such steps and to institute such proceedings as would fully protect the interests of said band of Indians. We are unable to agree with the claim of the appellees that by virtue of the treaty of New Echota this Eastern Band of Cherokees became citizens of the state of North Carolina, and of the United States. By the twelfth article of that treaty it was provided, in substance, that those individuals and families of the Cherokee Nation that were adverse to a removal to the Cherokee country west of the Mississippi, and were desirous of becoming citizens of the states where they resided, and such as were qualified to take care of themselves and of their property, and to become useful citizens, were to be permitted to remain within said states (North Carolina, Tennessee, and Alabama), and were to be entitled to receive their due portion of all the personal benefits accruing under said treaty for their claims, improvements, and per capita, and to a prescriptive right to certain lands. This certainly did not confer citizenship on any portion of the Cherokee Indians, and we are unable to find any statute or any treaty that makes them citizens of the United States, or that authorizes them to become citizens by naturalization. The action or assent of the United States is absolutely essential in order to enable the Indian tribes or bands, or individual members of the same, to renounce the dependent condition caused by the state of pupilage in which the Indians have been since the adoption of the federal constitution. If the treaty of New Echota can be held to authorize the members of the Eastern Band of Cherokees to apply to the courts for naturalization, on showing satisfactory proof of fitness for civilized life on their part, still it could not avail as far as this case is concerned; for there is no pretense that any of them have ever made such application, or ever been declared citizens of the United States by any court of the same, or of the state of North Carolina. On this subject, Judge Deady, in the case of U. S. v. Osborn, 6 Sawy. 406, 409, 2 Fed. 58, 61, has well said:

"But an Indian cannot make himself a citizen of the United States without the consent and co-operation of the government. The fact that he has abandoned his nomadic life or tribal relations, and adopted the habits and manners of civilized people, may be a good reason why he should be made a citizen of the United States, but does not of itself make him one. To be a citizen of the United States is a political privilege which no one, not born to, can assume without its consent in some form."

The effort to show that the Eastern Band of Cherokee Indians, in disposing of the timber in controversy, and in making the contract with Boyd, acted as a corporation created by the laws of the state of North Carolina, is without force; for it is well settled that neither the constitution of a state, nor an act of its legislature, can prevent the application of an act of congress to the Indian tribes residing in the states, but subject to the control of the general government. To hold otherwise would be to make the constitution of a state, and the

laws of the same, the supreme law of the land, instead of the constitution of the United States, and the laws and treaties made in pursuance thereof. City of Minneapolis v. Reum, 6 C. C. A. 31, 56 Fed. 576; U. S. v. Holliday, 3 Wall. 419; Worcester v. State of Georgia, 6 Pet. 515; Rollins v. Cherokee Indians, 87 N. C. 229. The congress of the United States has repeatedly, since the treaty of New Echota, recognized the Eastern Band of Cherokee Indians as a distinct portion of the Cherokee race, and has dealt with them, not as individuals, but as a band distinctive in character, dependent on the United States, and entitled to the aid and protection of the general government. 9 Stat. c. 118; 10 Stat. 291,700; 15 Stat. 228; 16 Stat. 362; 18 Stat. 213, 412; 19 Stat. 139, 176; 22 Stat. 328; 27 Stat. 122. The act of July 29, 1848 (cited above in 9 Stat.), treated said Indians as under the care of the United States, and provided that the sum of money due them under the treaty of New Echota should be held in the United States treasury indefinitely, and that interest thereon should be paid them. The act of July 27, 1868 (cited above in 15 Stat.), contained this provision:

"That hereafter the secretary of the interior shall cause the commissioner of Indian affairs to take the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians."

The act of July 15, 1870, § 11 (cited above in 16 Stat.), reads as follows:

"That the Eastern Band of the Cherokee Indians, by that name and style be, and they are hereby, authorized and empowered to institute and carry on a suit or suits in law or equity in the district or circuit courts of the United States against the present or former Indian agent or agents of said band. * * * It shall be the duty of the district attorney and the attorney-general of the United States to institute and prosecute all suits or causes which may arise under this section."

The act of June 23, 1874 (cited above in 18 Stat.), provides for surveying the lands of the Cherokee Indians of North Carolina, under the direction of the secretary of the interior. In the act of March 3, 1875 (cited above in 18 Stat.), the congress made provision for the payment of the costs, attorney's fees, and other expenses incurred in the prosecution of the suits of the Eastern Band of Cherokee Indians against William H. Thomas et al., which had been instituted as authorized by the act of July 15, 1870. The act of August 14, 1876 (cited above in 19 Stat.), directed the commissioner of Indian affairs to receive certain lands at their cash value, which was "to be determined by an appraisal to be approved by the secretary of the interior, and conveyed to the Eastern Band of Cherokee Indians in fee simple." The land here referred to is the land from which the timber was sold to Boyd by the contract in issue in this cause. The act of August 15, 1876 (cited in 19 Stat.), provides for the salary of a special agent for the Eastern Band of Cherokees, and then abolishes the office; but the act' of August 7, 1882 (cited in 22 Stat.), authorizes the secretary of the interior to appoint an Indian agent for said band of Indians. The act of July 13, 1892 (cited above in 27 Stat.), again abolished the office of Indian agent for the Eastern Band of Cherokee Indians, and required the superintendent of the Indian school at Cherokee, N. C., an officer of the United States government, to act as such agent for said Indians.

This shows that the original condition of the Indians in this country —that of pupilage under the government—has not been released, so far as this Eastern Band of Cherokees is concerned. It thus appears that the political departments of the government have recognized these Indians as constituting a tribe,—at least, within the meaning of that word as it is used in the constitution of the United States; and it is a rule of the courts, in matters of this kind, to follow the action of the executive and the departments whose duty it is to determine such affairs. U. S. v. Holliday, 3 Wall. 407. The supreme court of the United States, in U. S. v. Kagama, 118 U. S. 375, 384, 6 Sup. Ct. 1109, 1114, referring to this subject, says:

"The power of the general government over these remnants of a race once powerful, now weak and diminished in number, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

The appellees insist that, if the Eastern Band of Cherokee Indians were not made citizens by the treaty of New Echota, they certainly were by the act of congress of Febraury 8, 1887 (24 Stat. 388). That portion of said statute on which this insistence is based reads as follows:

"Sec. 6. * * * And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether such Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States, without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

This section has no application to a tribe of Indians, but is intended to cover the case of the individual Indian who has taken up his residence separate and apart from his tribe, and has adopted the habits of civilized life. There is no contention here that any members of the Eastern Band of Cherokees have so separated themselves from their band, thereby becoming citizens of the United States, and that as such they made the contract with Boyd concerning their individual property. On the contrary, it is the Eastern Band of Cherokee Indians, as such, that endeavors to sell the timber to Boyd, and to execute the contract relating to the same. Said statute is not applicable to the case we are now considering.

We are unable to agree with the court below that, because the United States sought the aid of a court of equity concerning the alleged contract said to have been made by Boyd with the Eastern Band of Cherokee Indians, it was the duty of the court, in the absence of fraud or unfair dealing in the making of the contract, to hold the same valid if the consideration paid for the timber mentioned therein was a fair and adequate price for the same. It must be kept in mind that the complainants below insisted in their bill that the United

States had refused to assent to the arrangements made by the council of the Eastern Band of Cherokees with Boyd, and that, therefore, no contract had in fact been made for the sale of the timber mentioned in the bill.    Finding this to be true, we think it follows that the defendants were removing said timber unlawfully, and that, therefore, they should have been restrained from so doing, and perpetually enjoined from further interfering with the same. . It will not do to say that the Indian tribes subject to the control of the department of the interior may be permitted to dispose of their property, real or personal, without the approval of that department, or over its protest, as in this case, and that the courts of the United States will sanction such proceedings, and decree them to be valid contracts, in the absence of fraud or unfair dealing.    We must presume that the department had good reasons for declining to approve said sale, and we think that, in the absence of fraud on the part of those representing it, its refusal to sanction negotiations of the character here involved is conclusive of the matter.    To hold otherwise would produce great confusion, and would transfer from that department to the courts most of the controversies relating to Indian affairs now properly disposed of by it; thereby fostering litigation, and producing continuous strife among the different Indian tribes.    The conclusion we reach is altogether independent of the questions raised concerning the power of the Eastern Band of Cherokees to sell and transfer the land conveyed to it by William Johnston and wife, as, either with or without the restrictive clause in the deed from Johnston and wife before mentioned, we find that the United States have the power to supervise and control the affairs of those Indians, so far as said land is concerned.

For the error indicated, the decrees complained of must be reversed, and this cause remanded to the court from whence it came, with instructions to enter a decree of the character indicated by this opinion. The rights of the parties, as affected by the money paid by those claiming under the supposed contract with Boyd, as well as by the damages, if any, occasioned by the unlawful removal of said timber, can be adjusted by that court on such just and equitable principles as may appear to be proper from the facts as they now appear, and as they may hereafter be presented.    Disposing of these questions as above indicated, we find it unnecessary to consider the other matters presented by the assignments of error.    Reversed and remanded.