## BOARD OF COMMISSIONERS OF MIAMI COUNTY ET AL. *v.* GODFROY.

[No. 3,735. Filed April 18, 1901. Rehearing denied June 26, 1901. Petition to transfer denied November 19, 1901.]

INDIANS.—*Taxation.*—*Citizenship.*—An Indian born in the United States, who has never held tribal relations, and who has availed himself of all of the rights of a citizen of the United States and has become a citizen of the United States within the meaning of §6 of the act of Congress approved February 8, 1887, is not entitled to exemption from taxation of lands, held by him by virtue of the treaty with the Miami tribe of Indians of 1838, under the provision of the ordinance of July 13, 1787, for the government of the territory northwest of the Ohio river that such lands and property "shall never be taken from them without their consent."

From Miami Circuit Court; *J. T. Cox,* Judge.

Suit by Gabriel Godfroy against the board of commissioners of Miami county to enjoin the taxation of plaintiff's lands which he claimed exempt as Indian lands. From a decree granting an injunction, defendant appeals. *Reversed.*

*J. Mitchell, N. N. Antrim, W. B. McClintic, W. C. Bailey* and *C. A. Cole,* for appellant.

*J. Farrar, W. O. Farrar* and *E. S. Morris,* for appellee.

Robinson, J.—Appellee avers in his complaint that he is a Miami Indian, and, as an Indian of the Miami tribe, lawfully residing in this State; that he is now and has been for many years the owner in fee and in possession of various tracts of land described; that these lands are included within a grant of lands to members of the Miami tribe of Indians by virtue of a treaty made by the United States and the tribe November 6, 1838; that he is a son of Francis Godfroy, deceased, late war chief of the Miami tribe, which held, previous to the treaty of 1838, all the lands in Miami county; that he was a member of the family of Francis Godfroy during his lifetime, and has never been a citizen of the United States; that the family of Francis Godfroy was by treaty permitted to remain in Indiana when the tribe removed from the State, and that appellee and his ancestors subsequent to the removal of the tribe from the State were enumerated and paid by the United States as members of the tribe; that none of the land in question has been in the adverse possession of any person who was not a member of the tribe and who as such was not by treaty permitted to remain in the State and enumerated and paid by the United States as a member of the tribe subsequent to the removal of the tribe from the State, nor in the adverse possession of any person who was not a descendant of the original grantees or a member of the original grantees' families under a conveyance executed by such owner; that these lands were exempt from taxation by

the ordinance of the 13th day of July, 1787, for the government of the territory northwest of the Ohio river; that the officers of Miami county are attempting to levy and collect taxes on the same, and praying an injunction. Appellants answered in eleven paragraphs, first of which was the general denial. Demurrers were sustained to the third, fourth, seventh, eighth, ninth, and eleventh paragraphs, and overruled as to the second, fifth, sixth, and tenth paragraphs. Appellee replied in eight paragraphs, the sixth and eighth of which were struck out on motion, and the third, fourth, and fifth of which were held bad on demurrer. The court made a special finding of facts and stated conclusions of law in appellee's favor. Appellants' motion for a new trial was overruled, and final decree entered awarding a perpetual injunction. The sufficiency of the complaint is questioned, but the questions argued may properly be considered in connection with the sufficiency of the third and fourth paragraphs of answer.

The fourth paragraph of answer admits that appellee is the son of Francis Godfroy late so-called war chief of the Miami tribe of Indians, denies that appellee or Francis was ever a member of the tribe or owed allegiance to the supreme authority of the same or to any other power than the United States, but that Francis was and appellee is and ever has been a citizen of the United States, that appellee was born within the territorial limits of the United States and has always lived within such jurisdiction; that ever since he has been twenty-one years of age he has elected to and has availed himself of all his rights as a citizen of the United States; that since arriving at age he has never lived on any tribal reservation of the Miami or any other tribe of Indians and has never subjected or submitted himself to the control or jurisdiction of any power other than the United States and the State of Indiana, but that ever since arriving at age he has voluntarily elected to take up and has taken up his residence in such county and State sep-

arate and apart from any tribe of Indians and adopted the habits of civilized life, has held his land in severalty, has tilled the same in the manner prevailing among white citizens of the same locality, has lived in a frame or brick house, has worn the ordinary garb of the white citizen in the vicinity, being the usual garb of the farmers of civilized communities of the United States, has voted at general elections, participated in political conventions as a delegate and voted at primary elections, has paid taxes and sent his children to the public schools, and in all respects lived and conducted himself after the manner and customs of his white neighbor citizens of the State during a period of more than forty years prior to filing his complaint herein. The material allegations of the third paragraph of answer are all contained in the fourth paragraph.

The act of March 6, 1891 (Acts 1891, p. 199), makes complete provision concerning taxation and repeals all laws in conflict therewith. It provides what property shall be taxed and what shall be exempt. The act of March 5, 1891 (Acts 1891, p. 115), providing a remedy for attempted taxation of Indian lands not subject to taxation and making such attempts unlawful, in so far as it is in conflict with the act of March 6th, was by that act repealed. But by the proviso to section one of the act of March 5th, its provisions do not apply where the owner of the land is a citizen of the United States. So that even if that act were in force an owner of these lands could not prevent their assessment for taxes if it appeared that at the time of the assessment such owner was a citizen of the United States.

It is insisted by counsel for appellee that these lands are not taxable, by virtue of the provisions of the ordinance of Congress of July 13, 1787, for the government of the territory northwest of the Ohio river.

The articles of that ordinance are declared to be articles of compact between the original states and the people and states in the territory, and that they shall forever remain unalter-

able unless by common consent. The third article of the ordinance provides that "The utmost good faith shall always be observed toward the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall, from time to time, be made for preventing wrongs being done to them, and for preserving peace and friendship with them."

The application of the people of the Indiana territory to form a Constitution and be admitted into the union was granted by Congress upon condition that the Constitution when formed should be republican and not repugnant to the articles of the ordinance of July 13, 1787. This condition was accepted by the territorial legislature of Indiana on the 10th day of June, 1816, and, upon the admission of the State, became a compact between it and the United States that certain portions of that ordinance should be kept in force. And it has been held that this provision in favor of the Indians should be liberally construed in their favor. *Choctaw Nation* v. *United States,* 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 306; *United States* v. *Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228.

In the case of *Board, etc.,* v. *Simons,* 129 Ind. 193, it was held that the third article of the ordinance of 1787 is in force in this State, citing *Me-shing-go-me-sia* v. *State,* 36 Ind. 310; *Wau-pe-man-qua* v. *Aldrich,* 28 Fed. 489. And in that opinion the court said: "It takes no argument to prove that if the State of Indiana can tax these lands, and sell them for the non-payment of such taxes, it may deprive the owners of such lands of their title and use without their consent. This the clause of the ordinance of 1787, above set out, prohibits." See *Revoir* v. *State, ex rel.,* 137 Ind. 332. From this it follows that Indiana had no power in and of itself to tax these Indian lands for any purpose.

In *Board, etc.,* v. *Simons, supra,* decided in 1891, the question arose upon taxes assessed for the years 1871 to 1877, inclusive, and the court held that the lands were not subject to taxation during the period for which they were assessed, but said: "What the status of this land is now we are not called upon to decide." See *Wau-pe-man-qua* v. *Aldrich, supra.*

As the above decisions were rendered prior to the passage of the act of Congress approved February 8, 1887, the question arises whether a different rule is not now applicable to such owners of these lands as come within the provisions of that act. The sixth section of that act provides: "And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property." 24 U. S. Stat. at Large, 388.

It is argued that the effect of this act is to confer all the rights of citizenship upon Indians who come within the classes designated; that they ceased to be Indians within the meaning of the ordinance of 1787, but became citizens of the United States, and as such citizens are subject to taxation the same as other citizens; and it is argued that appellee's complaint is bad for failing to exempt appellee from the class of Indians who were made citizens by that act, and that the third and fourth paragraphs of answer alleging the citizenship of appellee as a defense to his action were good answers.

In the case of *Elk* v. *Wilkins*, 112 U. S. 94, 100, 5 Sup. Ct. 44, 28 L. Ed. 645, the Supreme Court said: "The alien and dependent condition of the members of the Indian tribes could not be put off at their own will, without the action or assent of the United States. They were never deemed citizens of the United States, except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens on application to a court of the United States for naturalization, and satisfactory proof of fitness for civilized life; for examples of which see treaties in 1817 and 1835 with the Cherokees, and in 1820, 1825, and 1830 with the Choctaws, 7 Stat. 159, 211, 226, 335, 483, 488; *Wilson* v. *Wall*, 6 Wall. 83; Opinion of Attorney-General Taney, 2 Opinions of Attorneys-General, 462; in 1855 with the Wyandotts, 10 Stat. 1159; *Karrahoo* v. *Adams*, 1 Dillon 344, 346; *Gray* v. *Coffman*, 3 Dillon 393; *Hicks* v. *Butrick*, 3 Dillon 413; in 1861 and in March 1866, with the Pottawatomies, 12 Stat. 1192; 14 Stat. 763; in 1862 with the Ottawas, 12 Stat. 1237; and the Kickapoos, 13 Stat. 624; and Acts of Congress of March 3, 1839, ch. 83, §7, concerning the Brothertown Indians, and of March 3, 1843, ch. 101, §7, August 6, 1846, ch. 88, and March 3, 1865, ch. 127, §4, concerning the Stockbridge Indians, 5 Stat. 351, 647; 9 Stat. 55; 13 Stat. 562. See, also, treaties with the Stockbridge Indians in 1848 and 1856, 9 Stat. 955; 11 Stat. 667; 7 Opinions of Attorneys-General, 746."

Indian tribes residing within the territory of the United States, while they keep up their tribal relations, have always been regarded in the absence of some act of Congress as separate and distinct nations. The federal government has always entered into treaties with them as such. When engaged in war they have been treated as an independent nation and have been accorded the rights of an ordinary bel-

ligerant and have never been held subject to the law of treason. While such tribes have been regarded as separate and distinct nations, they have been subject to the protection of the general government. But the individual Indian might abandon his tribal relations and the habits and customs of Indian life.

It is quite true that appellee could not rid himself of his allegiance to his nation and become a citizen without the consent of the United States. The fact that he has abandoned his nomadic life or tribal relations, and has adopted the habits of civilized life, does not of itself make him a citizen. But the facts alleged in the answer show appellee to be a citizen within the meaning of the act of February 8, 1887. It was a matter of choice with him whether he continued a member of his tribe. The act of 1887 did not compel him to become a citizen. So long as he remained an Indian he was under the control of the United States *as an Indian.* But he voluntarily does what the law says makes him a citizen. This change of his tribal condition into individual citizenship was primarily his own voluntary act. He can not be both an Indian properly so-called and a citizen. The answer shows he has made his choice, and the act in question declares him to be a citizen. It has been held that this act has no application to a tribe of Indians, but is intended to apply to the individual Indian who has taken up his residence separate and apart from his tribe or nation and has adopted the habits of civilized life. *United States* v. *Boyd,* 83 Fed. 547, 27 C. C. A. 592.

It is true the sixth section of the act in question confers this citizenship "without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property." In the case of *United States* v. *Flournoy, etc., Co.,* 69 Fed. 886, the court said: "The fact, urged in argument, that under the laws of the state of Nebraska the Indians in question, to whom lands have been assigned in severalty, have the right to vote and to hold office, does not

necessarily show that the government of the United States no longer owes them any duty of protection in regard to the reservation lands, and no longer possesses any power of control over them as a tribe. In the act of Congress of February 8, 1887, which declares that Indians holding lands allotted in severalty are to be citizens of the United States, we find the express exception that such citizenship shall exist 'without in any manner impairing or otherwise affecting the right of any such Indians to tribal or other property.' "

But even if this clause should be construed as intending to continue in force that provision of the ordinance of 1787 exempting these lands from taxes, it is still not controlling. The ordinance provides that the lands and property of the Indians in the particular territory shall never be taken from them without their consent, and, as we have seen, this prohibits the imposition of taxes. But when appellee claims and exercises all the political and other privileges of other citizens, severs his tribal relations, adopts the customs of civilized life, becomes a citizen in fact with all its privileges and immunities, he is no longer the individual named in that ordinance. It must be held that when he becomes as any other citizen he consents that for the privileges of citizenship he will bear his share of the burdens. There is no reason for saying that the law intends that all classes of citizens shall enjoy the privileges of citizenship and that a part only shall bear the burdens that make those privileges possible. It is true that statutes concerning Indians and Indian tribes are to be liberally construed in their favor, but there is no reason for the application of this rule where the individual Indian has ceased to be an Indian properly so-called and has become a citizen. There was reason for the rule that while these lands belonged to an Indian as that term is used in the ordinance they should be exempt from taxes; but when he voluntarily places himself outside the particular class of individuals to whom this special protection was ex-

tended, and voluntarily becomes what the statute says is a citizen of the United States, the reason for the rule fails, and .the rule itself can no longer apply. The demurrer to the fourth paragraph of answer should have been overruled.

Judgment reversed.