UNITED STATES et al. v. W. T. MASON LUMBER CO.

(Circuit Court, W. D. North Carolina. September 10, 1909.)

1. INJUNCTION (§ 57*)—JURISDICTION—SUIT TO RESTRAIN THE CUTTING OF TIMBER.

Equity has jurisdiction of a suit to enjoin the cutting or removal of timber from land where the right to remove the same depends on the construction of a contract.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 112; Dec. Dig. § 57.*]

2. LOGS AND LOGGING (§ 3*)—SALE OF STANDING TIMBER—DURATION OF CONTRACT—EQUITIES OF PARTIES.

Defendant's assignor contracted with a tribe of Indians, subject to the approval of the Secretary of the Interior, for the purchase, for the sum of $15,000, of the timber of certain dimensions standing on a tract of land, the purchaser being given the right to construct sawmills, roadways, etc. The contract provided that it should be in force for 15 years from date, and that "all trees not cut and removed from said land at the expiration of this contract shall revert to and become the property of the parties of the first part." By reason of a suit brought by the United States in behalf of the Indians and of the failure of the Secretary to sooner approve the contract, defendant was delayed for nearly five years in commencing work thereunder, and at the expiration of 15 years from its date defendant had a large quantity of timber cut which it had not removed from the land. It had paid the full consideration of $15,000 in accordance with the terms of the contract. Held, that conceding that by a strict construction of the contract the timber so cut, but not taken from the land, would revert, the United States was not entitled in equity, under the circum-

stances, to enforce such provision, but that defendant had the right to remove said timber within a reasonable time.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 11; Dec. Dig. § 3;* Contracts, Cent. Dig. § 890.]

In Equity. On final hearing.

A. E. Holton, U. S. Atty., and A. L. Coble, Asst. U. S. Atty., for complainants.

Merrimon & Merrimon, for defendant.

NEWMAN, District Judge. This is a suit in equity, brought by the plaintiffs against the defendants to enjoin the latter from cutting and removing timber from a certain large tract of land, being a part of the Cathcart tract and within the Qualla boundary, the timber on which was the subject of an agreement between the Eastern Band of Cherokee Indians and David L. Boyd, on the 20th of September, 1893. By transfer from Boyd, and intermediate conveyances, all the rights Boyd acquired under the contract are in the W. T. Mason Lumber Company, the defendants here. The agreement is as follows:

"State of North Carolina, Swain County.

"This agreement made and entered into this the 28th of September, 1893, by and between the Eastern Band of Cherokee Indians in council assembled at Cherokee, N. C., a corporation and body politic under the laws of North Carolina, represented by a council vested with full powers to act for the said band in all matters pertaining to the affairs of the band whether in their corporate or tribal capacity, and especially authorized to enter into this contract, party of the first part, and David L. Boyd, contractor, of the town of Newport, in the state of Tennessee, party of the second part, witnesseth: That whereas the Eastern Band of Cherokee Indians in council assembled at Cherokee, in Swain county, North Carolina, passed resolutions authorizing the sale of the timber in the Cathcart tract of the Qualla boundary of land, a copy of which resolution marked 'Exhibit A,' is hereto attached and made a part of this contract, and whereas the said David L. Boyd, party of the second part, has made an offer of fifteen thousand dollars for the timber on the said tract now owned by the said Eastern Band of Cherokee Indians upon the terms, conditions and resolutions hereinafter set forth; and whereas at a council duly called and held at Cherokee, county of Swain, N. C., on the 28th day of September, 1893, a resolution was passed accepting the said offer by the council and authorizing and empowering Stillwell Sanwooka, James Blythe and Andy Standingdeer, a committee to execute the contract with the party of the second part for the sale of said timber, a copy of which resolution marked 'Exhibit B' is hereto attached and made a part of this contract.

"Now, therefore, the Eastern Band of Cherokee Indians in council assembled, party of the first part by virtue of an authority vested in them as heretofore stated and for and in consideration of the sum of fifteen thousand dollars to be paid by the party of the second part as hereinafter set forth, have bargained, sold, and conveyed, and by these presents do bargain, sell, and convey unto the said party of the second part, his heirs and assigns, subject to the conditions and resolutions herein contained the timber trees and fallen trees not cut into logs of the dimensions hereinafter set forth on so much of what is known as the Cathcart tract within the tract of land known as the Qualla boundary as shown on the map of the Qualla boundary made by M. S. Temple, and embraced in the deed by William Johnston and wife to the Eastern Band of North Carolina Cherokee Indians on the 9th day of October, 1876, and the timber within a tract containing 1,230 acres, situated within said Cathcart tract, it being No. 53, conveyed in the deed made by William Johnston and others to the Commissioner of Indian Affairs, trustee of the Eastern Band of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Cherokee Indians, in North Carolina on the 14th day of August, 1880, the said Cathcart tract of land situated and lying on the waters of Loco creek, in Jackson county, and Ocona-Lufta river, in Swain county, being grant No. 224, patented by the state of North Carolina to William Cathcart on the 20th day of July, 1796, and bounded as follows: Beginning at a locust stake and Chestnut oak in John Gray Blount's line at or near the path that leads out of the head of Johnathan's creek, and near a spring; thence running on John Gray Blount's line N. 45 W. 3,000 poles, crossing the main fork of Ocona-Lufta river to a stake in Blount's line, thence S. 45 W. 1,800 poles to a stake near a spruce pine; thence S. 45 E. 3,000 poles to a stake; thence N. 45 E. 1,800 (poles) to the beginning, containing 33,300 acres, which said grant or patent is registered in Book 3, page 163 of the office of the register of deeds, in Buncombe county, N. C., on the 9th day of August, 1796, it being the intention of the parties of the first part to sell the timber on so much of the land as is embraced within the said Cathcart tract as is now owned by the Eastern Band of Cherokee Indians, the tracts within said Cathcart tract owned by individual Indians aggregating about eight hundred acres, being excepted therefrom of the following dimensions taken at this date and species, namely: All poplar 22 inches in diameter and upwards; all chestnut, pine, and spruce 20 inches in diameter and upwards, walnut, cherry, birch, and oak 18 inches in diameter and upwards, hickory and box elder 12 inches in diameter and upwards, all other species of timber trees 18 inches in diameter and upwards, excepting locust which is not included in this contract; and the parties of the first part hereby give, grant, and assure to the party of the second part right of way thereto to fell, cut and remove said timber, and in addition to the above-mentioned timber trees to have the right to cut the necessary timber below the sizes herein named which may be required for the construction of railroads and tramways by the nearest possible road within the limits of the boundaries of the lands of the Eastern Band of Cherokee Indians, to be used in the removing of said timber trees and the use of such ground as may be necessary to erect sawmills, railroads, tramways, etc., the same to be constructed with as little damage to the improvements of said Indians as can be done without unnecessary expense to the parties of the second part, provided, however, that the said party of the second part shall pay to the Indian occupants of the said lands such damages to crops, houses, gardens, private roads and improvements to the Indians as they may sustain in the construction of said roads and tramways and in the removal of said timber.

"But, if the said Indian occupant and the party of the second part shall fail to agree as to the amount of damages sustained, the matter shall be referred to two disinterested parties, members of the council, one of whom shall be selected by said Indian or Indians, the other by the party of the second part, and in case of disagreement by the two they shall select a third man and the decision of the majority shall be final.

"And it is further agreed by and between the parties hereto that this contract shall be in force and effect for the period or fifteen years from date; and that all trees not cut and removed from said land at the expiration of this contract shall revert to and become the property of the parties of the first part. It is further agreed between the parties to this contract that the party of the first part, shall retain a lien on the timber trees herein conveyed for the purchase price at any time unpaid on the same but this lien shall not interfere with the manufacture or sale of sawed lumber in the ordinary course of business.

"Nothing in this contract is intended to prevent any Indian of the said bands from making boards from said timber to cover his buildings on the said Cathcart tract nor from removing any timber trees fallen and cut into logs at the date of this contract, or using any suitable timber within the said survey needed by them for the building of fences or the improvement of their farming lands. Nothing in this contract shall permit the party of the second part to cut any shade tree or any walnut, hickory or chestnut tree being or situate on lands in actual cultivation at the date of this contract of any Indian residing within the Cathcart survey. It is further agreed by the parties to this contract that the party of the second part shall pay the said sum of fifteen thousand dollars, as follows, viz.: Five thousand dollars upon the confirmation of this

contract by the Secretary of the Interior of the United States and five thousand dollars one year from this date, and five thousand dollars two years from this date. all of said payments evidenced by the promissory notes of David L. Boyd and the two last notes to bear interest at 6 per cent. per annum. In the event the Secretary of the Interior shall refuse to confirm this contract or action thereon should in any wise be delayed longer than October 27th, 1893, then and in that event the party of the second part agrees to cut, log and saw said timber and to pay the first notes so soon as one-third on Loco is cut, logged and sawed, and the second of said notes when another third of the Loco timber is cut, logged and sawed, but in no case shall the timber be removed until the payments are made as above set forth. All payments to be made to the bank or persons designated by parties of the first part authorized to receive the same.

"If at any time any controversy should arise between the parties to this agreement it is stipulated and agreed that all matters in dispute shall be referred to two good and disinterested citizens of the state of North Carolina as arbitrators vested with power to pass upon all such matters in controversy, and in case of disagreement to call in a third man, the award of the majority to be final.

"The parties of the first part covenant that they will forever warrant and defend the title to the timber trees above conveyed to the party of the second part, and his heirs and assigns, against the lawful claims of all persons whatsoever.

"In witness whereof, the parties of the first and second parts have hereunto set their hands and seals the day and year above written.

|  |  |  |
|---|---|---|
| "Eastern Band of Cherokee Indians, | [Seal.] |
| "By Stillwell Sanwooka, | [Seal.] |
| "James Blythe, | [Seal.] |
| "Andy Standingdeer. | [Seal.] |
| "Witnesses:          D. L. Boyd. | [Seal.] |
| "J. M. Moody. |  |
| "Thos. F. Davidson." |  |

The above instrument was properly acknowledged before Thos. A. Jones, judge of the criminal court of Buncombe county, N. C.

It appears from the record in this case that, soon after the execution of this contract, certain parties who had acquired rights from Boyd under the agreement proceeded to make arrangements to cut timber from the lands in question, without having obtained the approval of the contract by the Secretary of the Interior. It seems to have been the understanding between the parties when the contract was made that this approval would be obtained without difficulty. In the year 1895. a bill was filed in this court by the United States of America, Samson Owl, and others, Cherokee Indians, against Boyd and others, seeking to enjoin them from exercising any of their rights under the contract in question.

The principal question raised in that case, as will be seen by the decisions of the Circuit Court in the case of United States et al. v. Boyd et al., 68 Fed. 577, decided by Judges Simonton and Dick, and the case in the Circuit Court of Appeals (United States v. Boyd, 83 Fed. 547, 27 C. C. A. 592), was whether or not the Circuit Court had jurisdiction of the case; that question depending upon the relation which the United States bears to the Eastern Band of Cherokee Indians. A full discussion of the subject will be found in those cases, the result of which was that it was held that the United States did have supervision of the affairs of this band of Indians, and that it was its right and duty to look after their interests; and, that being the case, the

United States could properly bring the bill, and, as a consequence, the court had jurisdiction of the case. It was further held by the Circuit Court of Appeals that, in the absence of the approval of the contract by the Secretary of the Interior, the same was invalid, and that the defendants in that case were attempting to remove timber unlawfully. The case in the Circuit Court of Appeals, as will be seen, was not decided until November 5, 1897; and on the 18th day of May, 1898, the approval of the Secretary of the Interior was obtained to the contract, and its predecessors in right under the agreement, and the defendant company, have since, and until September 28, 1908, been cutting and removing timber, when it ceased operations on the lands.

The present bill was filed on November 16, 1908, at Greensboro, N. C., and in July, 1909, was transferred to this court. It is alleged in the bill:

"That the said defendant is now cutting and removing the said timber from the said land notwithstanding the right so to do ceased under the terms of said contract on the 28th day of September, 1908, and notwithstanding due notice has been given them to cease their operations, and that since the 28th day of September, 1908, the said defendant, its agents and employés, as the plaintiffs are informed and believe, have continued cutting and removing timber within the boundary of the said Cathcart tract, and is still cutting and removing timber therefrom in large quantities, and have so cut and removed as the plaintiffs are informed and believe some 4,000.000 or 5,000,000 feet of lumber since the expiration of said contract of the value of $10,000 or more, as plaintiff is informed and believes, to great injury and damage to the Eastern Band of Cherokee Indians and its property; that the said defendant threatens to continue and is continuing its waste and destruction upon the timber situate upon said land, and is thereby committing and threatening to commit great permanent and irreparable injury to said lands and the destruction of the timber thereon which is the principal substance and value of the land, which if allowed to be removed will be practically valueless, and that the plaintiffs will suffer irreparable injury for which they have no adequate remedy at law."

Upon the filing of this bill Judge Boyd made a temporary restraining order, and directed the defendants themselves to show cause on the first Monday in December why an injunction should not be granted as prayed. The case coming on to be heard on the 27th day of December, 1908, an agreement appears to have been made, resulting in an order of the court as follows:

"Circuit Court of the United States, Western District of North Carolina,
"Fourth Circuit.
"United States of America, Eastern Band of Cherokee Indians, Stillwell Sanwooka, James Blythe, and Andy Standingdeer v. The W. T. Mason Lumber Company.
"Order.

"This cause coming on to be heard upon the notice heretofore issued therein and served upon the defendant, The W. T. Mason Lumber Company, to appear at Charlotte, N. C. on the first Monday in December, 1908, to show cause why it should not be restrained and perpetually enjoined from cutting and removing the timber from the said lands described in the bill, it appears to the court that the defendant has agreed with the plaintiffs as follows:
"First, that the defendant would not engage in cutting any standing timber on said land until the further order of this court; and that the plaintiffs agree with the defendant that the defendant shall have the privilege of making sale of all timber cut and now remaining on said land and not sawed into lumber at such price as shall be approved by this court, and this privilege shall continue

until the further order of this court, and in the event that a sale shall be made and approved by the court, the proceeds arising shall be under the control of the court until the further order of the court.

"It is therefore now ordered that the terms agreed upon between the parties be and hereby are approved and adopted as the order of this court.

"As it now appears to the court there is no reason why the defendant should not be permitted to remove and dispose of the sawed lumber which was sawed prior to September 28th, 1908, and it is therefore ordered by the court that the defendant be and hereby is, permitted to sell and dispose of such lumber unless for good cause shown it shall hereafter be restrained by this court.

"The foregoing agreement and orders as expressly understood and agreed between the parties are made without prejudice to the defendant's rights to object to the jurisdiction of the court upon any ground it may wish to assign by demurrer, plea or answer to the bill of complaint herein.

"This the 7th day of December, A. D., 1908.

"[Signed]   Jas. E. Boyd, U. S. Judge."

The defendant answered the bill on December 18, 1908, proofs were taken, and the case is now before the court on final hearing on bill, answer, and evidence.

1. The first question raised in the case is whether or not the court has jurisdiction. In effect, it is the same question that was raised in the case referred to in the Circuit Court and decided by Judges Simonton and Dick, and in the Circuit Court of Appeals. I think this court is clearly controlled by those decisions on the question of jurisdiction. The opinions of Judges Simonton and Dick and the opinion of Judge Goff in the Circuit Court of Appeals very ably and fully discuss the questions involved, and it would be useless and a mere waste of time to attempt to add anything to them.

2. The next question is as to whether the defendant was doing or attempting to do anything by itself or its agents and employés which would justify a court of equity in granting an injunction in the case; that is, whether there was anything to enjoin. Of course, on the face of the bill presented to Judge Boyd a clear case was made, and the right to a restraining order was apparent in the absence of a proper showing by the defendant of facts to the contrary. It appears from the evidence in this case that, while the defendant company did not intend to do any more cutting of timber after September 28, 1908 (indeed they claim to have stopped cutting a day or two before that time), they did intend to remove the timber already cut, amounting to some 4,-000,000 or 5,000,000 feet.

Mr. E. H. Hall, secretary and treasurer of the defendant company, testified on cross-examination as follows:

"Q. You intended to move all of this timber that you cut down as fast as you could, did you not, this timber you cut down during the latter part of the year, just before the 26th of September? A. Yes; I think so.

"Q. Just as fast as you could? A. Yes.

"Q. It would be dangerous to remain long? A. Yes; to all of it if it remained long enough.

"Q. You intended to continue your work there didn't you? A. We had notice that this deed or contract expired on the 27th, and, of course, it all depended upon the termination of that. We contended that it did not, and, of course, these logs would be worthless in there, if not moved.

"Q. You expected to continue that part of it? A. Yes.

"Q. You got notice from the Indian agency or some one? A. We got the notice from Mr. Harris over there, saying that our time expired on the 27th, I believe.

"Q. And after you received that notice? A. We took him at his word, and did not do anything; that is, did not cut any more timber.

"Q. You continued to haul logs? A. Yes.

"Q. And make roads? A. Yes.

"Q. But you did not cut any logs after the 28th of September? A. No, sir; I don't think so.

"Q. You never sawed any after the 28th? A. I think they sawed some trees into logs. I don't think they logged any. I am not sure.

"Q. What quantity of timber did you think you had down there? A. I cannot tell.

"Q. Four or five million feet? A. Yes; I think there is that much. I am not an expert.

"Q. Did you ever have that much down before at one time? A. I don't think so."

The contention of the government was, and is, that the contract expired on December 28, 1908, and that all trees not both cut and removed from the land by that time should revert to and become the property of the Cherokee Indians; that is, all trees not removed from the land, although felled and lying on the ground, should revert to the Cherokee Indians. Based on this contention and the case thereby made, it is clear that a cause of action exists cognizable in a court of equity and in this court, the jurisdiction here existing by reason of the United States being a party, as heretofore stated.

3. The next question is as to the relative rights of the parties under this contract, in view of all the facts connected therewith and of the present situation. The contract provided, in referring to payments, for "$5,000 upon the confirmation of this contract by the Secretary of the Interior of the United States," and, further on in the contract, this expression occurs: "In the event the Secretary of the Interior shall refuse to confirm this contract," etc. From this it will be clearly seen that the approval of the Secretary of the Interior to the contract was considered necessary to make the contract effective and valid. From what has been stated before, it will also be seen that by the action of the government in filing its former bill, and by the action of the Secretary of the Interior in declining to approve the contract until May 18, 1898, the purchaser of this timber was delayed something more than four years and seven months in getting to work to cut and remove the timber which he purchased and had paid for in full. There is no doubt but that it was the contemplation of the parties to the contract that the purchaser should have 15 years in which to cut and remove the timber. By the action of the Secretary of the Interior in declining to approve this contract, resulting also in the previous litigation referred to, they lost, as stated, more than four years and seven months of this time. Should the government now be heard to say against the assignee in right of the purchaser of this timber that the 15 years should commence from the time the contract was entered into, when, by its action, the purchasers were prevented for such a considerable part of the period from carrying on the work under the contract? The contention of the government is that the contract commenced, as stated therein, from its date, and that the purchaser of this timber and his assignees knew that the approval of the Secretary of the Interior was not obtained until 1898; and yet, with a full knowledge of this fact, and believing themselves to be able to cut and remove all the timber of the sizes pur-

chased during the period remaining, they continued with the contract, and that, more than 10 years remaining, they had ample time in which to get the full benefit of the contract, and to realize fully all the rights to which they were entitled under it.

I am doubtful about this, and careful reflection has not removed the doubt which I had on hearing the case. While I am not able to agree entirely with the contention of the defendant in this matter as to this feature of the case of one thing I am perfectly clear, and that is that the company should have the right to remove the timber already cut on the land. We are in a court of equity—a court of conscience—and in my opinion it would be wholly inequitable to refuse the defendant this right in view of all that has occurred in the case. The company, knowing that it would be claimed that the contract expired on the 28th of September 1908, exercised great diligence in cutting timber for a month or two before and up to that time. They cut timber which they had purchased and paid for long before, and, in view of the interruptions which they had had, and the long delay in getting to work, they should certainly be allowed to remove the timber which they had cut within that period. It is true that the language is "all trees not cut and removed from said land at the expiration of said contract shall revert to and become the property of the party of the first part." The contention of the government is that, because this timber had not been removed, as well as cut, it reverted to the Cherokee Indians. The language is: "All trees not cut and removed. * * *" Taking this in connection with the right granted by the contract to erect sawmills, railroads, tramways, etc., I do not know that the contract should be construed so as to mean that all the timber cut before the expiration of the contract, and still on the land of the Indians, should revert to them. If it be strictly construed in that way, even timber now on the tramways or at the mills, would revert to the Indians. It was probably originally contemplated by the parties that the trees would be removed to the sawmills, and sawed up, the whole work going on together. Towards the expiration of the contract, on account of the great distances, this being impossible, it seems within the fair meaning of this contract, properly construing it, that the company should have the right to take these trees to the mills, saw them up, and get the benefit of them. The contention of the defendant's counsel is that, when trees are severed from the stump, they are removed within the meaning of this contract. Whether this be true or not, I am inclined to think, taking the whole language of the contract together, that it was never contemplated that fallen trees should revert, even if after they are felled they are "trees" within the meaning of the contract, which is doubtful. Be this as it may, however, I am perfectly clear, in view of the delay which the purchasers of this timber have suffered by reason of the action taken on behalf of the Indians, that it would be wholly inequitable to refuse to allow them to remove the timber cut within the period limited by the contract.

In several recent decisions the Supreme Court of North Carolina has held that instruments like this convey an absolute title in the timber embraced in the contract, defeasible as to timber not removed within

172 F.—46

the time limited. In Mining Company v. Cotton Mills, 143 N. C. 307, 55 S. E. 700, Chief Justice Clark says:

"It is true, as contended by the plaintiff, that 'a deed purporting to convey all the wood and timber therein described vests in the grantee a present state of absolute ownership in said timber defeasible as to all timber not removed within the time required by the terms of the deed.' Lumber Company v. Corey, 140 N. C. 462, 53 S. E. 300; Hawkins v. Lumber Company, 139 N. C. 160, 51 S. E. 852; Bunch v. Lumber Co., 134 N. C. 116, 46 S. E. 24."

In Lumber Company v. Corey, the first headnote is as follows:

"A contract to cut all timber of an indicated measurement on certain land, for a fixed period, passes a present estate in the timber defeasible as to all timber not cut within the limit of the time fixed."

A defeasance should not be extended beyond its necessary import and meaning. In this case it is, in effect, a forfeiture of timber bought and paid for, and forfeitures are not favored by the law; so I think on the whole there can be no doubt of the right of the defendant company to remove the fallen timber. They should be allowed a reasonable time to do this. As to what a reasonable time would be, I will hear counsel on some day of the present term, when it will be convenient for counsel for the government and defendant. When this time shall have been fixed, a decree may be taken in accordance with what has been said.