RUSSO–CHINESE BANK v. NATIONAL BANK OF COMMERCE OF SEATTLE, WASH.

(Circuit Court of Appeals, Ninth Circuit. April 3, 1911.)

No. 1,888.

1. APPEAL AND ERROR (§ 765*)—FILING AND SERVICE OF BRIEFS—COMPLIANCE WITH RULES OF COURT.

Rule 24 of the Circuit Court of Appeals, requiring counsel for a plaintiff in error to serve upon counsel for defendant in error a copy of their printed brief at least ten days before the case is called for argument, was sufficiently complied with where a case was set for argument on the 11th of a month, and on the 1st counsel for the plaintiff in error deposited copies of their brief in the post office in San Francisco in sealed envelopes, with postage prepaid, addressed to counsel for defendant in error at their proper addresses in Seattle.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3100; Dec. Dig. § 765.*]

2. EXCEPTIONS, BILL OF (§ 43*)—TIME PRESCRIBED BY RULE FOR FILING AND SERVICE—EXTENSION BY COURT.

Where, nearly 30 days after the entry of a judgment by the Circuit Court for the District of Washington, and at the same term, the judge made an order extending the time within which the losing party might file and serve a bill of exceptions, reciting that it was made for good cause shown, and within the extended time the bill was served and afterward settled by the judge, such bill of exceptions will be accepted and will not be stricken from the files by the appellate court, although by rule 75 of the trial court it was required to be served and filed within 10 days after the verdict.

[Ed. Note.—For other cases, see Exceptions, Bill of, Cent. Dig. § 72½; Dec. Dig. § 43.*]

3. COURTS (§ 352*)—FEDERAL COURTS—CONFORMITY TO STATE PRACTICE.

If the state law permits a nonsuit where the evidence with all the inferences to be drawn therefrom would not sustain a verdict for the plaintiff, the practice may be followed by a federal court under the provisions of the conformity statute (Rev. St. § 914 [U. S. Comp. St. 1901, p. 684]),

but, if the evidence is sufficient to sustain the cause of action, a motion for nonsuit should be denied.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 926–932; Dec. Dig. § 352.*

State laws as rules of decisions in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

4. **Payment** (§ 89*)—**Recovery of Payments—Mistake of Fact—Action—Pleading.**

A complaint alleging that plaintiff paid money to defendant under a mutual mistake of fact states a cause of action for its recovery as money had and received to plaintiff's use, and a further allegation of a promise to repay it if defendant's representation on which it made the demand should prove incorrect is unnecessary, and plaintiff is not required to sustain it by proof.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 291–296; Dec. Dig. § 89.*]

5. **Payment** (§ 85*)—**Action to Recover Payment—Mistake of Fact—Defenses.**

Defendant, a Seattle bank, sent a three months' draft drawn by a mill company on a customer to plaintiff's branch bank at Port Arthur, China, for acceptance and collection at maturity. About the time it matured, the investment of Port Arthur by the Japanese became complete. It was not paid, and was protested and mailed with the protest to defendant, but was not received, and was lost. Afterward defendant represented to plaintiff at St. Petersburg that the draft had been paid, demanded the money, and threatened suit. Plaintiff answered that, owing to the war, it was unable to ascertain the facts, but yielded to the demand, and paid the amount of the draft and interest, with the reservation that, if it should later be ascertained that it had not been paid, the money should be returned, and defendant promised to repay it on return of the bills showing that the draft had not been paid, provided that it was "in no wise injured by the fact that your Port Arthur branch had indefinitely held the bills after their maturity." *Held* that, even if such condition were binding on plaintiff, it constituted no defense to an action to recover the money where it was shown that the draft was taken up from defendant by the drawer before it received the money from plaintiff.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 272–281; Dec. Dig. § 85.*]

6. **Evidence** (§ 414*)—**Competency.**

Parol evidence is admissible to show the date of the acceptance of a sight draft for the purpose of establishing the date of its maturity.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1858; Dec. Dig. § 414.*]

7. **Evidence** (§ 178*)—**Best and Secondary Evidence—Proof of Acceptance of Lost Draft.**

Where a sight draft had been lost, parol evidence was admissible to show that it had been accepted, and the date of the acceptance.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 580–594; Dec. Dig. § 178.*]

In Error to the Circuit Court of the United States for the Northern Division of the Western District of Washington.

Action at law by the Russo-Chinese Bank against the National Bank of Commerce of Seattle, Wash. Judgment for defendant, and plaintiff brings error. Reversed.

On the 10th day of December, 1903, the Centennial Mill Company, of Seattle, delivered to the Boston Steamship Company and Boston Towboat Company, at Seattle, 35,312 quarter sacks of flour for shipment by the steam-

ship Hyades to Clarkson & Co. at Port Arthur and/or Dalny in Manchuria. The Centennial Mill Company received from the steamship company its bill of lading in duplicate. The bill of lading contained the following: "Received from Centennial Mill Co. * * * for shipment at Seattle, by steamship Hyades * * * 35,312 Qr. Sax Flour * * * to be carried by said steamer or any other steamer of the above company to the port of Port Arthur &/or Dalny * * * and to be there delivered unto shipper's order or to his or their assigns. (Notify Clarkson & Co.)"

The flour had been sold to Clarkson & Co. at Port Arthur on terms of 90 days' draft, through the Russo-Chinese Bank, at $4.10 per barrel, amounting to $36,194.80. It appears that Clarkson & Co. were merchants at Port Arthur engaged in buying and selling different kinds of goods. They were also agents at that place for different steamship companies, including the Boston Steamship Company and the Boston Towboat Company, and were therefore the agents of the steamship Hyades, which carried the 35,312 quarter sacks of flour sold by the Centennial Mill Company to Clarkson & Co., to be delivered to the latter at Port Arthur. The Centennial Mill Company had made other sales of flour to Clarkson & Co. which need not be referred to in this opinion. The Russo-Chinese Bank is a banking corporation existing under the laws of the Russian Empire, with its head office at St. Petersburg, and with numerous branches throughout the empire. At the dates referred to in this case it had a branch bank at Port Arthur, Manchuria, and another at Shanghai, China. In referring to either of these banks hereafter we shall designate it by its locality.

In accordance with the terms of the sale of the flour a draft was drawn by the Centennial Mill Company on Clarkson & Co. at Port Arthur for $36,194.80, with exchange and collection charges payable in 90 days after sight to the National Bank of Commerce, at Seattle. The Centennial Mill Company procured insurance on the flour with the Fireman's Fund Insurance Company of San Francisco in the sum of $40,000. The Centennial Mill Company thereupon took this draft on Clarkson & Co., the bill of lading issued to it by the steamship company for the flour, the insurance policy issued by the Fireman's Fund Insurance Company attached thereto, and delivered the same to the National Bank of Commerce at Seattle, with whom the Centennial Mill Company regularly transacted business, and, in accordance with the customary business usage, the bank discounted the draft, and paid the mill company the value thereof. Thereupon the bank sent the draft wtih the other documents by letter dated December 11, 1903, to the Port Arthur branch of the Russo-Chinese Bank for collection. The letter was received by the latter in due course of mail on January 22, 1904, according to the Gregorian, or "new style," calendar, or on January 9, 1904, according to the Julian, or "old style," calendar. The new style calendar prevails in this country. The old style in Russia. Under the latter the corresponding date is 13 days earlier than in this country. The dates referred to in this opinion will be according to the "new style" calendar in use in this country, and will involve a change of dates to that extent in documents issued, and transactions had in Port Arthur. The letter with its inclosures, received by the Port Arthur branch of the Russo-Chinese Bank on January 22,. 1904, from the National Bank of Commerce of· Seattle, was acknowledged on the same date. In this letter of acknowledgment the Port Arthur bank called the attention of the Seattle bank to the fact that instructions were required as to the return of documents accompanying the draft if the draft should be protested for nonacceptance or nonpayment. The letter states: "Please note: (1) That, unless otherwise instructed, bills of any description sent us for procuring acceptance and/or for collection will be protested both for nonacceptance or nonpayment and immediately returned to the sender. (2) When sending us for collection documents and bills or only documents clearly state in your letter accompanying same whether in case of dishonor: (a) Both bills and documents are to be promptly returned with the relative deed of protest, or (b) if the bill is to be returned and the relative documents are to be kept here at your disposal, or (c) if the goods are to be stored by us and fire insurance is to be recovered pending receipt of your instructions."

It does not appear that the Seattle bank ever furnished the Port Arthur

bank any instructions with respect to the matters referred to in this letter. The Port Arthur bank presented the draft to Clarkson & Co. for acceptance on January 23, 1904. It was accepted by Clarkson & Co. on January 30, 1904, and on the same date the Port Arthur bank notified the Seattle bank by letter of the acceptance of the draft. The acceptance of the draft on January 30, 1904, fixed its maturity on April 30, 1904. On April 28, 1904, or two days before the maturity of this draft, the Port Arthur bank received a telegram from the Shanghai branch of the Russo-Chinese Bank making inquiry concerning a reported sale of the flour by Clarkson & Co. without paying for it. The Port Arthur bank replied that the draft was due on the following day; that the fact that Clarkson & Co. had got possession of the flour through the bill of lading in the hands of the bank was due to Clarkson & Co. being the agents of the steamer carrying the flour and could be in no way prevented by the bank. On April 30, 1904, the draft became due, but was not paid. Under the Russian law two days' grace are allowed in the matter of the payment of bills of exchange. At the expiration of this period of grace, on May 2, 1904, the Port Arthur bank delivered the draft to the notary public at Port Arthur for protest. On the following day, May 3, 1904, the draft was protested.

The Russo-Japanese War, formally declared February 10, 1904, was then in progress. The Japanese had been directing naval operations against the Russian naval base at Port Arthur from February 9, 1904, at which date a complete blockade of Port Arthur on the water side had been effected by the Japanese fleet. About May 3, 1904, it was completed by the Japanese military forces on land, and, when the deed and protest was received by the bank from the notary, communication between Port Arthur and the outside world had been completely cut off by the beseiging forces of the Japanese army. The draft with the deed of protest was thereupon placed by the Port Arthur bank in its safe to be kept until such time as communication should be restored. On January 2, 1905, the Japanese forces took possession of all the papers and documents belonging to the Russo-Chinese Bank at Port Arthur, and retained possession of them until March, 1906, when they were all returned to the Russo-Chinese Bank. While the books, papers, and effects of the Port Arthur bank were in the possession of the Japanese the bank had no access to them. When they were returned to the bank, they were taken to the home office of the principal bank at St. Petersburg.

Pending this situation of affairs at Port Arthur, the Seattle bank, on July 7, 1904, wrote to the St. Petersburg bank that Clarkson had advised the Centennial Mill Company that certain drafts on Clarkson & Co., including the one due on April 30, 1904, had been paid before maturity. To this letter the St. Petersburg bank replied to the effect that it was unable at that time to correspond with the Port Arthur bank, and was unable to trace the matter referred to, but, as soon as it was possible to investigate the subject, it would not fail to revert to it. These letters were followed by others passing between the two banks, in which the Seattle bank insisted that it had information that Clarkson & Co. had paid the amount of the draft to the Port Arthur bank and demanding payment. The St. Petersburg bank repeated its former statement that communication with Port Arthur had been suspended, and it was unable to trace the matter. Finally, on October 12, 1904, the Seattle bank concluded a letter upon the subject addressed to the St. Petersburg bank with the following: "We would respectfully request that you notify us immediately on receipt of this letter what you propose doing in the premises, and trust you will not by further delay compel us to take steps in this country to enforce our rights, which we most certainly shall do."

The St. Petersburg bank replied under date of November 9, 1904, in which, after referring to matters connected with the controversy, it said: "Of course, as the matter now stands, we are unable to discuss the question any further and therefore, hand you enclosed, in cover of the bill for: U. S. $36,194.80, claimed by you, cheque on Messrs. Ladenburg, Thalmann & Co., New York, for U. S. $36,013.70, as per note at foot, receipt of which kindly acknowledge. *It remains of course however understood that in case your above remittance proves not to have been paid for by Clarkson & Co. you are held responsible to refund the amount of our today's cheque.*"

The Seattle bank replied under date of December 5, 1904, acknowledging receipt of the draft for $35,013.70, but declining to accept that amount as full payment for the draft. In this letter the Seattle bank said: "The draft to this date would amount to G$38,312.19, leaving a balance due us of G$2,298.49, which we would respectfully request that you remit us by return mail. *We on our part agree upon return to us of both sets of bills, showing that the draft has not been paid, to reimburse you in the sum paid us, provided, that we were in no wise injured by the fact that your Port Arthur branch has indefinitely held the bills after their maturity, at which time they could have been returned to us and we could have collected from the Steamship Company.*"

To this letter the St. Petersburg bank replied under date of December 29, 1904, inclosing check for the additional amount of $2,298.49, with this statement: "*It remains understood that in case your above remittance proves not to have been paid, you declare yourselves ready to refund us these $2,298.49 with the $36,013.70 sent on 27/9 November, plus accrued interest.*" The Seattle bank under date of January 18, 1905, acknowledged the receipt of the check for $2,298.49 with this guarantee: "*We agree that guarantee contained in our letter of December 5 shall also cover this amount.*"

When the St. Petersburg bank received from the Japanese government the books and documents belonging to the Port Arthur bank, it was discovered after investigation that Clarkson had not paid the draft of the Centennial Mill Company; that the draft upon Clarkson & Co. had been protested, and with deed of protest had been mailed to the Seattle bank on May 26, 1904. On June 27, 1906, the St. Petersburg bank wrote to the Seattle bank the result of this investigation, and asked that the two sums of $36,113.70 and $2,298.49 which it had paid to the Seattle bank with interest from the dates of remittances be refunded to the St. Petersburg bank. After further correspondence between the banks, the Seattle bank refused to refund the money received from the St. Petersburg bank, and thereupon the latter brought this action at law to recover judgment against the Seattle bank for the two sums named.

In the complaint the facts relating to the controversy were alleged substantially as has been stated, with this further allegation relating to the repayment of the two sums of money paid by the St. Petersburg bank to the Seattle bank, namely, that the payments were made upon condition "*that if it should thereafter be ascertained that said drafts had not been paid the said sums should be repaid to it by the defendants, to which condition defendant assented and agreed in writing.*"

In an amended answer the Seattle bank admitted the sending of the draft drawn by the Centennial Mill Company upon Clarkson & Co. to the Port Arthur bank for collection, the receipt of the draft by the Port Arthur bank, but denied information as to the date of its receipt or whether the draft was accepted by Clarkson & Co. or not. It admitted that during a portion of 1904 the empires of Russia and Japan were at war; alleged that the draft and protest were never returned to the defendant; admitted that it had represented to the plaintiff that the draft had been paid in full to the Port Arthur bank, that it had demanded payment of the amount of the draft in full, and that it had threatened to sue the plaintiff in the courts of the United States if the draft was not paid, that it had demanded the payment by the plaintiff to the defendant the amounts stated in the complaint; *but denied that the payments had been made upon condition that, if it should thereafter be ascertained that said draft had not been paid, the said sums should be repaid to the plaintiff; denied that the defendant agreed or assented in writing or at all to any such condition, but alleged that the defendant agreed upon its part upon the return to the defendant of both sets of bills and a showing that the draft had not been paid to reimburse the plaintiff with the sums paid to the defendant, provided that the defendant was in no way injured by the negligence of the plaintiff in connection with the collection of said draft, or in the performance of its duties, or in the handling of said draft or the documents connected therewith;* alleged that no showing of nonpayment of said draft had ever been made, and that neither of said sets of bills or any bill had ever been returned to the defendant

by the plaintiff covering the transaction referred to in the complaint, and that the plaintiff had never fulfilled or performed the conditions agreed upon by the plaintiff and defendant at the time the payments were made as alleged in the complaint.

Defendant alleged as an affirmative defense that the draft drawn by the Centennial Mill Company on Clarkson & Co. was paid in full and plaintiff received such payment in full. Defendant further alleged as an affirmative defense that the flour represented by the bill of lading was appropriated by Clarkson & Co. to their own use and the proceeds were not applied to the payment of such draft, and that the proceeds of the sale of the flour were not used and applied toward the payment of the draft; that the failure to have the same so applied toward the payment was due to the carelessness and negligence of the plaintiff, and was due to a breach of duty that the plaintiff owed to the defendant to cause said flour or proceeds thereof to be utilized for the payment of said draft; that the plaintiff did not protest the draft at the date of its maturity, and did not return the draft and the documents accompanying the same to the defendant, and all without cause or reason to the great injury and damage to the defendant.

In plaintiff's reply it denied the agreement as to the condition of the payment made by the plaintiff as alleged in defendant's answer; and denied any connection with or responsibility for the delivery of the flour to Clarkson & Co.

The case was tried before the court and a jury. Upon the conclusion of the evidence on the part of the plaintiff, the defendant moved the court for a nonsuit on the ground that there had been a total failure of proof to sustain the complaint. The motion appears to have been granted on the ground that the action was based upon a contract in writing, and the plaintiff had failed to prove the promise alleged in the complaint, and that it had failed to prove that the protested draft and accompanying documents had been returned to the defendant as alleged in defendant's answer. The plaintiff brings the case here by writ of error.

T. L. Stiles, Chickering & Gregory, and Winfield Dorn, for plaintiff in error.

George De Steiguer, James A. Kerr, and E. S. McCord, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The defendant in error has interposed motions to dismiss the writ of error, and strike from the files of the court the bill of exceptions. Both motions are made on the ground that the plaintiff in error has failed to comply with certain rules of court.

[1] The first motion is based upon an alleged failure of the plaintiff in error to comply with rule 24 of this court[1] requiring counsel for the plaintiff in error to file with the clerk of the court 20 copies of the printed brief and serve upon the counsel for the defendant in error one copy thereof at least 10 days before the case is called for argument. This case was set for argument for the 11th day of October, 1910. The 20 copies of the printed brief were filed with the clerk of the court as required by the rule, and it appears from an affidavit on file that counsel for the plaintiff in error served their brief upon counsel for defendant in error on the 1st day of October, 1910, by depositing copies in the post office at San Francisco, in sealed envelopes addressed to the counsel for the defendant in error at Seattle, Wash., with postage prepaid. We think this service comes within the rule, but, had there been such a delay of the delivery of the briefs at Seattle as to in

[1] 150 Fed. xxxiii, 79 C. C. A. xxxiii.

any way prejudice counsel for the defendant in error in filing their reply brief, this court upon a proper showing would have made a suitable order with respect thereto.

[2] The second motion is based upon an alleged failure of the plaintiff in error to prepare and have settled a bill of exceptions in accordance with the provisions of rule 75 of the United States Circuit Court for the District of Washington. That rule provides that:

"The party desiring the bill (of exceptions) shall * * * within ten days after the rendition of the verdict * * * serve upon the adverse party a draft of the proposed bill of exceptions."

The judgment was entered on March 17, 1910. The law of the state of Washington provides that a proposed bill of exceptions must be filed and served either before or within 30 days. The plaintiff in error appears to have delayed action in that proceeding under the mistaken belief that this statute prevailed in the federal court, for on the 11th of April, 1910, an order was entered extending the time until May 14, 1910, in which the plaintiff in error might file and serve its bill of exceptions. A copy of this order was served upon defendant in error with the proposed bill of exceptions within the time as extended by such order. Such order was made during the term in which the judgment was entered. It recited that it was made for good cause shown. The exceptions were seasonably taken and reserved, and they were put in form and filed in the case by direction of the judge. This was held sufficient in Stanton v. Embrey, 93 U. S. 548, 555, 23 L. Ed. 983. We think that, under the authority of this case and the practice prevailing in this court, the bill of exceptions should be accepted. Southern Pacific Co. v. Johnson, 69 Fed. 559, 16 C. C. A. 317; City of Seattle v. Board of Home Missions, 138 Fed. 307, 70 C. C. A. 597. Both motions are accordingly denied.

[3] Upon the merits we are of opinion that the allegations of the complaint state a cause of action upon an implied agreement to restore money paid to the defendant in error by the plaintiff in error under a mistake of fact, and that the evidence introduced on behalf of the plaintiff tended to sustain such a cause of action. The rule now established in the federal courts is this: If the state law permits a nonsuit where the evidence with all the inferences to be drawn therefrom would not sustain a verdict for the plaintiff, the federal court may do likewise under the provisions of section 914 of the Revised Statutes of the United States (page 684, U. S. Comp. St. 1901). Central Transp. Co. v. Pullman's Car Co., 139 U. S. 39, 40, 11 Sup. Ct. 478, 35 L. Ed. 55; Meehan v. Valentine, 145 U. S. 618, 12 Sup. Ct. 972, 36 L. Ed. 835; Coughran v. Bigelow, 164 U. S. 308, 17 Sup. Ct. 117, 41 L. Ed. 442. It follows that, if the evidence in such a case is sufficient to sustain the cause of action, a motion for a nonsuit should be denied. Such is the rule established by the Supreme Court of the state of Washington. Welch v. Fransioli, 46 Wash. 530, 90 Pac. 644.

[4] The evidence in the case before us was to the effect that the plaintiff on November 9, 1904, paid to the defendant the amount sued for upon representations made by the defendant that the Port Arthur bank had previously received from Clarkson & Co. the amount called

for in the draft; that at the time this payment was made the plaintiff stated to the defendant that the payment was being made without knowledge of the exact conditions established between the defendant and plaintiff's Port Arthur branch for the collection of its documentary bills, and there was evidence that the draft had not in fact been paid to the Port Arthur bank. The Seattle bank claimed that the draft of the Centennial Mill Company on Clarkson & Co. had been paid to the Port Arthur branch of the St. Petersburg bank, and that the Seattle bank was entitled to have this amount refunded, and so represented to the St. Petersburg bank. There was evidence tending to show that this representation was a mistake on the part of the Seattle bank. There was also evidence tending to show that the St. Petersburg bank, influenced by the representations of the Seattle bank and relying upon such representations that the draft had been paid to its branch bank at Port Arthur, paid the amount of the draft with interest and charges to the Seattle bank. This was a mistake on the part of the St. Petersburg bank; that is to say, the evidence tended to show that both parties to the transaction were acting under a mistake of fact. In such a case the failure of the complainant to prove an agreement in writing "that, if it should be thereafter ascertained that said draft had not been paid, the said sum should be repaid to it by the defendant," was immaterial, as the allegation of such an agreement was unnecessary in the statement of the cause of action.

In Leather Manuf. Bank v. Merchants' Bank, 128 U. S. 26, 9 Sup. Ct. 3, 32 L. Ed. 342, the Supreme Court said:

"Whenever money is paid upon the representation of the receiver that he has either a certain title in property transferred in consideration of the payment, or a certain authority to receive the money paid, when in fact he has no such title or authority, then, although there be no fraud or intentional misrepresentation on his part, yet there is no consideration for the payment, and the money remains, in equity and good conscience, the property of the payer, and may be recovered back by him, without any previous demand, as money had and received to his use."

In Fidelity Savings Bank v. Reeder, 142 Iowa, 373, 120 N. W. 1029, the following were the facts of the case: The defendant was a depositor in the plaintiff bank, and presented his book to withdraw his account. It was shown that the amount due him at that date, principal and interest, was $1,285.22, and no more, and this amount the defendant admitted he received. Plaintiff claimed, however, that by mutual mistake of the parties the amount due the defendant was computed as being $1,385.22, and that acting upon such mistaken belief its cashier paid to the defendant the latter sum making an overpayment of $100, which upon demand the defendant refused to refund. Plaintiff in its petition not only alleged overpayment by mistake, but further alleged that, after discovering the error, defendant admitted the mistake and promised to rectify it. The court held that, even if the plaintiff wholly failed to prove the alleged admission and promise of repayment, it was still entitled to recover if the jury should find that if by mistake of the parties overpayment had in fact been made. The court had instructed the jury that proof of the alleged admission and the promise to repay was essential to

plaintiff's recovery. This charge was excepted to as casting upon plaintiff an unduly heavy burden. The Supreme Court of Iowa was of the opinion that the contention was well founded. It said:

"Even though the plaintiff had wholly failed to prove the alleged admission and promise of repayment, it was still entitled to recover if the jury should find that by mistake of the parties an overpayment to the defendant had in fact been made. The right to recover money paid by mistake is too well established to require argument, and such right is in no manner dependent upon an express admission by the party receiving it, or on his agreement to refund."

In support of this doctrine the court cites numerous decisions, and then says:

"The allegation of such admission and promise in plaintiff's petition was unnecessary to a statement of a cause of action, and he was not required to sustain it by evidence."

[5] In this aspect of the case plaintiff was clearly entitled to have defendant's motion for a nonsuit denied; but, if we turn to the condition upon which the Seattle bank proposed to return the money to the St. Petersburg bank and the evidence relating to such condition, we reach the same conclusion. The condition as stated by the Seattle bank in its letter of December 5, 1904, was as follows:

"We on our part agree upon return to us of both sets of bills, showing that the draft has not been paid to reimburse you in the sum paid us, provided, that we were in no wise injured by the fact that your Port Arthur branch has indefinitely held the bills after their maturity, at which time they could have been returned to us and we could have collected from the Steamship Company."

There was evidence that the draft had not been paid, and that the draft together with the protest had been returned to the Seattle bank in a letter written to the Seattle bank by the Port Arthur bank under date of May 26, 1904. There was testimony that this letter was not received by the Seattle bank, and, although it was introduced in evidence and read, it was subsequently objected to by the defendant and excluded as, we think, erroneously. As the exclusion of this letter is assigned as error, we shall refer to that ruling later in the opinion. For the present, it is sufficient to say that the deposition of Alexander Friedberg, an officer of the Port Arthur bank, was introduced in evidence, who testified that:

"The draft for $36,194.80 was protested April 20/May 3, 1904, and returned with the deed of protest to the National Bank of Commerce of Seattle with the letter dated May 13/26, 1904."

The deposition of Alexander Drozdov, another officer of the bank, was also introduced in evidence. He testified:

"The draft for $36,194.80 was protested and returned to the National Bank of Commerce, together with the protest in letter dated May 13/26, 1904."

This testimony we think tended to establish the fact that the protested draft had been mailed to the Seattle bank. When these depositions were taken, there does not appear to have been any question about the fact. If there was any doubt upon that subject, the witnesses should have been cross-examined as to what was meant by their

statements that the draft was returned to the Seattle bank with the letter dated May 26, 1904.

With respect to the final condition that the Seattle bank should not have been injured, it appears from the evidence that, before the Seattle bank received the repayment from the St. Petersburg bank, the Seattle bank had been paid in full by the Centennial Mill Company. This evidence comes from R. R. Spencer, who was the cashier of the Seattle bank during the transactions involved in this case, and who was the first vice president when he gave his testimony. His testimony is as follows:

"Q. I will ask you whether or not prior to the time the Russo-Chinese Bank paid you the money that they are now suing for the Centennial Mill Company had paid the National Bank of Commerce this draft. What is the fact about it? A. They took up the draft and paid us for the draft quite a little while before we received the money from the Russo-Chinese Bank."

It thus appeared that even on the conditions for repayment proposed by the Seattle bank the evidence before the court did not entitle it to a nonsuit; but the evidence remains clear and uncontradicted that the payments made to the Seattle bank by the St. Petersburg bank were made under a mistake of fact upon which the law raises an implied agreement to restore the money, and we are of the opinion that the complaint stated a cause of action upon such an implied promise, and that a motion for a nonsuit should have been denied. Whether the Port Arthur bank was negligent in dealing with the draft appears to be a question raised by the pleadings. It is set up as a defense to the action by the Seattle bank, but it is denied by the St. Petersburg bank, and there is evidence tending to support that denial. The question was therefore not involved in the nonsuit. It follows that we are of the opinion that the judgment should be reversed and a new trial granted.

In view of such new trial, we will notice the assignments of error relating to the exclusion of evidence on the motion of the defendants. In the deposition of Alexander Friedberg he was asked this question:

"Q. State if you know whether Clarkson & Co. accepted said draft and if they did, what date? A. Yes; Clarkson & Co. accepted said draft on January 17/30, 1904."

[6] This answer was struck out on the motion of counsel for the defendant on the ground that the acceptance of the draft must have been by an instrument in writing, and the writing should be produced, but the evidence was not offered for the purpose of establishing a liability upon the draft upon the evidence required by the statute of frauds, but for the purpose of fixing the date when the draft was accepted. This could be established by the testimony of any one competent to testify and who had knowledge of the fact. The witness appears to have had knowledge of this fact.

[7] It further appears that the draft itself had been lost. If the acceptance was indorsed on the draft as is usual, then it could not be produced and secondary evidence as to the date of its acceptance was admissible.

With respect to the extract from the entries in the books of the Port Arthur bank relating to this draft, it is objected that the book from which the extract was taken was not sufficiently identified as an original book of entry; that there was no evidence that the entries were made at the time the transactions were made by a person authorized to make them and made in due course of business. We think the book was not so identified, and that the objection was properly sustained.

The copy of the letter of May 26, 1904, was attached to the deposition of Alexander Friedberg, and a copy was also attached to the deposition of Alexander Drozdov. These depositions were read in evidence together with the copy of the letter attached to each. The original letter was called for by the plaintiff from the defendant, and the response by the defendant's cashier was that it had not been received. Thereupon counsel for the defendant moved to exclude the copy of the letter attached to the deposition of Friedberg on the ground that the correctness and truthfulness of the copy-book had not been established, and it had not been shown that the original letter had been mailed. Friedberg in his deposition stated:

"I beg to attach * * * an identified copy of letter date May 13/26, 1904, addressed to the National Bank of Commerce of Seattle with which the protested draft for $36,194.80 was returned. * * * The draft for $36,194.80 with the deed of protest was received back from the notary at Port Arthur at the time when communication was cut off both at sea and on land. Under such circumstances, the mail could not be forwarded from Port Arthur, and therefore the bank kept the draft with the deed of protest in the safe until communication should be re-established."

We think this was a sufficient identification of the letter and the fact that it was mailed. This letter inclosed the missing draft, and, together with the draft, appears to have been lost. We think the copy of the letter was therefore admissible, particularly in view of the fact that the copy of the letter attached to the deposition of Drozdov was read in evidence, and not objected to or excluded.

The judgment of nonsuit is reversed, with instructions to grant a new trial and such further proceedings as are not inconsistent with this opinion.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes