**UNITED STATES v. 7,405.3 ACRES OF LAND IN MACON, CLAY, AND SWAIN COUNTIES, N. C., et al.**

No. 4284.

Circuit Court of Appeals, Fourth Circuit.

June 6, 1938.

the United States as trustee for the Eastern Band of Cherokee Indians, and on the other by the Nantahala Power & Light Company. While the amount involved in this particular case is not large, as the land was valued at only $3 per acre, the questions at issue are important because of their bearing on other titles. The court below held that, although the United States, as trustee for the Indians, claimed under an older grant than the Power Company, the latter had the superior title because of adverse possession. Whether such adverse possession can avail the company under the circumstances of the case is the principal question presented by the appeal, although affirmance is asked on the additional grounds that the grant relied upon by the United States is void because not registered in the county where the land lies within the time prescribed by statute, Code N.C.1935, § 7579, and that neither the grant nor subsequent conveyances were admissible in evidence to establish title because not registered in that county prior to the institution of suit.

A preliminary question arises upon appellee's motion to dismiss the appeal, based upon the fact that no bill of exceptions was signed, nor order entered extending the time for signing bill, within forty days of the judgment, as required by rule of court. It appears, however, that order extending the time was entered during the term and that the bill of exceptions was signed within the time as thus extended; and, as the judge had complete jurisdiction over the cause as long as the term continued, he had power therein to enter the order of extension, notwithstanding the limitation of the rule. While the term continues, the rule is a "guide for the exercise of discretion, not a limitation upon the court's power". United States v. Tucker, 4 Cir., 65 F.2d 661, 663; Hunnicutt v. Peyton, 102 U.S. 333, 353, 26 L.Ed. 113; Russo-Chinese Bank v. National Bank of Commerce, 9 Cir., 187 F. 80, 86; Czizek v. Western Union Tel. Co., 9 Cir., 272 F. 223, 226. Our conclusion would, of course, be different if the term had expired prior to the entry of the order extending the period. Harris v. United States, 4 Cir., 70 F.2d 897.

William D. Donnelly, Atty. Department of Justice, of Washington, D. C., (Julius Martin II, Sp. Atty., Department of Justice, of Asheville, N. C. and C. W. Leaphart, Atty., Department of Justice of Washington, D. C., on the brief), for appellant.

Stanley W. Black, of Bryson City, N. C., and William M. Hendren, of Winston-Salem, N. C. (Black & Whitaker, of Bryson City, N. C., on the brief), for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and HAYES, District Judge.

PARKER, Circuit Judge.

This is a controversy over the right to a fund paid into court in a condemnation proceeding, the question being as to the ownership of 55.9 acres of land in Macon County, North Carolina, claimed on the one hand by

The claim of the United States as trustee for the Indians is based upon a grant from the State of North Carolina to William H. Thomas, dated June 9, 1875, and registered in Swain County on May 2, 1879. The land covered by the grant lies in Macon County, which adjoins Swain, but the grant

was not registered in that county until March 31, 1936, after the United States had filed answer in this proceeding. The tract here in controversy, together with 67 others, was included in the following mesne conveyances, viz.: Deed from Commissioners of the United States Circuit Court for the Western District of North Carolina and the Guardians, Commissioners and Attorneys of William H. Thomas to the Commissioner of Indian Affairs of the United States, known as the Sibbald deed and dated August 14, 1880; deed from the Commissioner of Indian Affairs to the Eastern Band of Cherokee Indians, a North Carolina corporation, dated March 26, 1902; and deed from, the Eastern Band of Cherokee Indians, the corporation, to the United States as trustee, dated July 21, 1925. No possession by Thomas or the Indians was shown. The claim of the Power Company is based upon a grant from the State of North Carolina to A. P. Munday and others, dated August 31, 1887, and duly registered in Macon County on November 23, 1887. The Company connected itself with this grant by mesne conveyances and showed actual possession of the land extending over a period of twenty years following the grant.

 We think it clear that title was acquired by the Commissioner of Indian Affairs for the benefit of the Eastern Band of Cherokees as a result of the grant to Thomas in 1875 and the Sibbald deed to the

Commissioner of Indian Affairs in 1880. It is true that the Thomas grant was not registered in Macon County, where the land lies, until 1936, that registration within two years was required, and that, while the time for registration of grants was extended from time to time, no extension was granted beyond January 1, 1929. It is well settled, however, that under the laws of North Carolina "registration of a grant is not necessary to give it validity for the purpose of passing title". Janney v. Blackwell, 138 N.C. 437, 50 S.E. 857, 858; Pennell v. Brookshire, 193 N.C. 73, 136 S.E. 257; Dew v. Pyke, 145 N.C. 300, 59 S.E. 76; Wyman v. Taylor, 124 N.C. 426, 32 S.E. 740; North Carolina Mining Co. v. Westfeldt, C.C.N. C., 151 F. 290, 303. "Registration is, indeed, necessary to make it evidence of the title which the state has granted." Dew v. Pyke, supra (page 78). But on the admissibility of the grant in evidence, it appears that it was registered in Swain County, a county adjoining Macon, in 1879, within the period of the extension granted by statute for the registration of grants. And provision was specifically made by the North Carolina laws of 1858-1859, c. 18, and by the Revisal of Public Statutes of 1873, c. 35, sec. 11, for the registration in the proper county and use in evidence of certified copy of "any deed or writing required or allowed to be registered" and registered in an adjoining county. See Weston v. Lumber Co., 160 N.C. 263, 75 S.E. 800.[1]

---

[1] Laws of 1858–59, c. 18, was entitled "An Act for the Better Security of Titles to Land and other Property", and was as follows:

"Whereas, By reason of the uncertainty of the boundary lines of many of the counties of this State, deeds, wills and other writings have been proved, recorded and registered in the wrong county, whereby titles are become insecure, for remedy whereof:

"Section 1. Be it enacted by the General Assembly of the State of North Carolina, and it is hereby enacted by the authority of the same, That upon the production of any properly certified copy of the record of any will with the probate thereof from the county court of a county, wherein the same shall appear to have been duly proved as required by law before the county court of any adjoining county, it shall be lawful for the latter court to order such transcript to be filed and recorded, as if the original had been proved before it.

"Section 2. Be it further enacted, That a duly certified copy of any deed, or

writing required or allowed to be registered, may be registered in any adjoining county.

"Section 3. Be it further enacted, That the registry or duly certified copy of the record of any will, deed or writing recorded or registered, pursuant to the provisions of this act, may be given in evidence in any of the courts of this State." (Ratified the 16th day of February, 1859).

The provision of the Revisal of Public Statutes of 1873 is as follows:

"Whereas, By reason of the uncertainty of the boundary lines of many of the counties of this State, deeds, wills, and other writings have been proved, recorded and registered in the wrong county, whereby titles are becoming insecure, for the remedy whereof,

"*The General Assembly of North Carolina do enact*, That a duly certified copy of any deed or writing required or allowed to be registered may be registered in any adjoining county; and the registry or duly certified copy of any deed or writing so registered may be given in evidence in any court of the State."

The Code of 1883, sec. 1253, generalized this provision and same as generalized has been brought forward in subsequent codifications of the laws. It is now section 3319 of the North Carolina Code of 1935 and is as follows:

"A duly certified copy of any deed or writing required or allowed to be registered may be registered in any county; and the registry or duly certified copy of any deed or writing when registered in the county where the land is situate may be given in evidence in any court of the state."

Little need be said as to the point that the Thomas grant and other instruments under which the United States asserted claim for the Indians were not registered in Macon County until after answer was filed. Under the circumstances here, the only relevancy of the fact of registration in the county was with respect to the admissibility of the instruments in evidence; and it is well settled under the law of North Carolina that, for the purpose of rendering it admissible in evidence, registration of an instrument may be had at any time before it is actually offered. Pennell v. Brookshire, 193 N.C. 73, 136 S.E. 257; Herbert v. Union Development Co., 170 N.C. 622, 87 S.E. 515; Brown v. Hutchinson, 155 N.C. 205, 71 S.E. 302; Hudson v. Jordan, 108 N.C. 10, 12 S.E. 1029, 1030. As said in the case last cited: "The plaintiff had the equitable title without registration, and could introduce the deed as evidence, if registered the very day of the trial."

We come then to the principal question in the case, and the one upon which it was decided in favor of the Power Company by the court below, viz.: Did adverse possession under the junior grant mature title in favor of the adverse claimants as against these Indian wards of the United States claiming under the senior grant? The answer to this question depends upon the status of this band of Indians as wards of the United States, a matter which we considered fully in the recent case of United States v. Wright, 4 Cir., 53 F.2d 300, at pages 302 to 305. After giving a brief history of the origin of the Eastern Band of Cherokees, their acquisition of lands in the State of North Carolina and their recognition as an Indian tribe under the protection of the United States, we summed up their status in the following language (page 304):

"Not only with respect to the acquisition and preservation of the title to this land, but also in practically every other way imaginable, the government of the United States from 1868 to the present day has continuously guarded and protected the interests of this band of Indians, and has done everything possible to promote their progress and development. It has supervised their contracts and instituted suits for the cancellation of contracts which were thought not advantageous to them. U. S. v. Boyd (C.C.) 68 F. 577; Id. (C.C.A. [4 Cir.]) 83 F. 547. It has appointed agents to guide them in the management of their affairs. It has built schools, including a large boarding school, and provided teachers for the education of their children. It has provided an experienced farmer to go among them and teach them the arts of agriculture. It has provided a hospital for the care of their sick, and has made provision for the care of their deaf, dumb, blind, and insane. It has provided a physician and a field nurse to go among them and care for the sick in their homes. It has furnished food and clothes for their school children, and has made allowances to members of the tribe to aid in their support. In other words, it has for more than sixty years treated them in all respects as wards of the nation, and has expended in recent years more than $100,000 annually for their support. It appears that for the fiscal year 1930 the appropriation for this purpose was approximately $135,000.

"In contrast to this, the state of North Carolina has afforded them few of the privileges of citizenship. It has not furnished them schools, and forbids their attendance upon schools maintained for the white and colored people of the state. It will not receive their unfortunate insane or their deaf, dumb, or blind in state institutions. It makes no provision for their instruction in the arts of agriculture or for the care of their sick or destitute. It supervises their roads; but until comparatively recent years these were maintained by their own labor. It affords them the protection of the laws of the state; but, because their land is held in common and they live under a primitive tribal organization, the laws of the state, which are adapted to an advanced civilization, touch their lives at but very few points. In other words, *the life of this band of Indians, from an economic standpoint, both in its relation to the federal government and to the state, has been for more than sixty years practically that of other Indian tribes.* Politically they have

been subject to the laws of the state, but economically they have been wards of the federal government and cared for as such under the provisions of its laws." (Italics supplied.)

Regarding the status of the Band as wards of the government, we said:

"The fact that the Eastern Band of Cherokee Indians had surrendered the right to their tribal lands, had separated themselves from their tribe, and had become subject to the laws of the state of North Carolina, did not destroy the right or the duty of guardianship on the part of the federal government. The fact that they constituted a community of these aboriginal people who were wards of the government was sufficient basis for the exercise of the power; and to what extent the power should be exercised was for Congress to decide. Even the conferring of citizenship upon the Indians and allotment of lands to them in severalty does not place them beyond the reach of congressional regulations adopted for their protection. United States v. Sandoval, supra [231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107]; Tiger v. Western Inv. Co., 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738; Heckman v. U. S., 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820; U. S. v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192; Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L.Ed. 591. And the principle is well settled that whether the protective and regulatory power of Congress shall be extended over an Indian community is a political question with the determination of which the courts have no power to interfere. United States v. Holliday, 3 Wall. 407, 419, 18 L.Ed. 182; Tiger v. Western Inv. Co., supra; United States v. Sandoval, supra; Sisseton & Wahpeton Bands of Sioux Indians v. U. S., supra [277 U.S. 424, 48 S.Ct. 536, 72 L.Ed. 939]. * * * In this case there can be no question but that the Eastern Band of Cherokee Indians is a distinctly Indian community. Congress for more than half a century has recognized it as such, and has extended to it the guardianship and protection of the government. In the opinion of Assistant Attorney General Campbell in 1904 approved by Secretary Hitchcock (copied in the record at pages 117-141) is contained a summary of the acts of Congress passed up to that time for the care and protection of the band, and the Assistant Attorney General thus summarizes his conclusions with regard thereto: 'From the foregoing necessarily prolix recitals it is manifest that the government has all along exercised a supervisory control over this band of Indians both in matters growing out of the treaties with the Cherokee Nation proper and the relations of the band itself involving the approval and disapproval of deeds and contracts with respect to the acquisition and sale of their lands and the disposal of the timber thereon. Since 1868, under specific legislation, the same supervisory charge has been taken of the Eastern Band of Cherokee Indians of North Carolina as of other tribes of Indians. There is nothing in recent legislation nor in the decrees of the courts to warrant the adoption of a different course or policy in regard to them. On the contrary, the courts fully recognize such authority and decline to interfere with its exercise, thus conceding that it exists nowhere else.' "

Prior to the decision in the Wright Case, the status of the Band of Indians as wards of the federal government had been recognized by this court in the case of United States v. Boyd, 4 Cir., 83 F. 547, 555, where Judge Goff, after reciting various acts of Congress showing that the government was exercising the right of guardianship over the affairs of the Band, said:

"This shows that the original condition of the Indians in this country—that of pupilage under the government—has not been released, so far as this Eastern Band of Cherokees is concerned. It thus appears that the political departments of the government have recognized these Indians as constituting a tribe,—at least, within the meaning of that word as it is used in the constitution of the United States; and it is a rule of the courts, in matters of this kind, to follow the action of the executive and the departments whose duty it is to determine such affairs."

In Rollins v. Eastern Band of Cherokee Indians, 87 N.C. 229, the Supreme Court of North Carolina refused to entertain a suit against this band of Indians on the ground that they were under the guardianship of the federal government. The court said of the Act of Congress of July 15, 1870 (16 Stat. 362, sec. 11), that, if it did not confer, it recognized a corporate capacity in them as a collective body or tribe. It said further:

"The remnant band of Cherokees remaining in the state, by distinct legislative action, have been placed upon the same footing with other Indian tribes, under the protection and care of the government, and

these' statutory provisions [i. e. those for the protection of Indians] apply with equal pertinency and force to them as to that portion of the tribe who have emigrated and been located in their western home. * * * It is obvious that the Indian tribes are in a state of pupilage to the general government, and the safe-guards of law are placed over them to secure them and their property from the artful practices of designing men, the dictate of an enlightened sense of national duty to the weak and defenceless of a race rapidly diminishing in numbers, and deemed incapable of self-protection."

The tract of land here in controversy was one of those purchased for the Indians by W. H. Thomas under the circumstances set forth in the Wright Case. It was conveyed along with 67 other tracts, to the United States Commissioner of Indian Affairs "for the use and benefit of the Eastern Band of Cherokee Indians" by the Sibbald deed of August 14, 1880, which was executed under order of court in a suit which had been instituted pursuant to act of Congress for the protection of the interests of the Indians. In 1889 a corporate charter was granted the Indians by the State of North Carolina which authorized them to exercise limited powers of self government under the laws of the state; and in a suit concerning the lands instituted in 1890, a compromise decree was entered to the effect that the lands should be conveyed to the corporation by the Commissioner of Indian Affairs but a proviso was inserted that nothing therein contained should "be construed as interfering with the right of the Commissioner of Indian Affairs from exercising such supervisory charge over the person and property of said band of Indians and the members thereof and the contracts of said Indians as that officer now has by virtue of the Constitution of the United States and the treaties and laws in pursuance thereof." The deed of the Commissioner of Indian Affairs to the corporation contained the same proviso. The corporation held title to the lands for the benefit of the Indian tribe until July 31, 1925, when it conveyed them in trust to the United States pursuant to the Act of June 4, 1924, 43 Stat. 376, 25 U.S.C.A. § 331 note, for the purpose of allotment.

■ It is clear, from the foregoing statement, not only that this band of Indians are wards of the federal government, just as are other Indian tribes for whose protection the power of that government is exerted, but also that the tract of land here in controversy is one of those belonging to the Indians, which have been acquired and preserved for them largely through the activities of the federal government. Whether the legal title to the lands has been vested in Thomas, in the Commissioner of Indian Affairs, in the North Carolina corporation or in the United States itself, it has been held in trust for the benefit of the tribe, which is under the guardianship of the federal government, and for that reason it may not be divested except in accordance with the laws of the United States.

■ As we were at pains to point out in the Wright Case, it makes no difference that title to the land in controversy was originally obtained by grant from the state of North Carolina, or that the Indians are citizens of that state and subject to its laws. The determinative fact is that the federal government has assumed towards them the same sort of guardianship that it exercises over other tribes of Indians, from which it results that their property becomes an instrumentality of that government for the accomplishment of a proper governmental purpose and may not be taken from them by contract, adverse possession, or otherwise, without its consent. United States v. Candelaria, 271 U.S. 432, 440, 46 S.Ct. 561, 562, 70 L.Ed. 1023; United States v. Minnesota, 270 U.S. 181, 196, 46 S.Ct. 298, 301, 70 L.Ed. 539; United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107; Heckman v. United States, 224 U.S. 413, 438, 32 S.Ct. 424, 56 L.Ed. 820. Indeed, a statute of the United States expressly forbids the acquisition of lands of any Indian tribe by purchase, grant, lease or other conveyance, except by treaty or convention and subjects to penalty anyone not being employed under the authority of the United States who attempts to negotiate such treaty. R.S. § 2116, 25 U.S.C.A. § 177. This statute protects Indians such as these as well as the nomadic tribes. United States v. Candelaria, supra. And the protection is not affected by reason of the fact that the band has been incorporated under a state charter and attempts to take action thereunder. United States v. Boyd, supra, 4 Cir., 83 F. 547, 553. Certainly if the land was not alienable by the Indians, title could not be obtained as against them by adverse possession. Schrimpscher v. Stockton, 183

U.S. 290, 295, 22 S.Ct. 107, 46 L.Ed. 203; Garcia v. United States, 10 Cir., 43 F.2d 873.

In holding that adverse possession under a state statute of limitations would not give title to restricted lands of an Indian which he was forbidden to convey, the Supreme Court of Oklahoma in Patterson v. Carter, 83 Okl. 70, 200 P. 855, stated the doctrine here applicable as follows (page 857):

"As a dependent people these Indians are still wards of the federal government against which the statute of limitations does not run. In these circumstances it would be futile to hold that the statute of limitations commenced to run against the Indian himself upon reaching his majority, although it did not run against his general guardian, the United States. It is well settled that there can be no adverse possession against the federal government which can form a basis of title by estoppel, or under the statute of limitation, and it has been held that the same rule applies where the lands involved are lands that have been allotted to Indians with restrictions upon the alienation of title thereto by the Indians, so long as such restrictions upon alienation exist."

See, also, Baldridge v. Caulk, 110 Okl. 185, 189, 237 P. 453, 456; Tobley v. Dekinder, 110 Okl. 63, 65, 237 P. 617, 619; McLish v. White, 97 Okl. 150, 152, 223 P. 348, 350; Sandlin v. Barker, 95 Okl. 113, 116, 218 P. 519, 522; Sheldon v. Donohoe, 40 Kan. 346, 349, 19 P. 901, 903; McGannon v. Straightlege, 32 Kan. 524, 525, 4 P. 1042, 1043.

If adverse possession will not give title under state statutes of limitation against restricted allotments of individual Indians, a fortiori such possession cannot give title to lands held in trust for the common benefit of the tribe over which the United States exercises guardianship. It is beyond the power of the state, either through statutes of limitation or adverse possession, to affect the interest of the United States; and the United States manifestly has an interest in preserving the property of these wards of the government for their use and benefit. As said in the Heckman Case, supra (32 S.Ct. page 432), "If these Indians may be divested of their lands, they will be thrown back upon the Nation a pauperized, discontented * * * people". The lands held for them are thus an instrumentality in the discharge of the duty which the government has assumed toward them. Title to it can no more be acquired by adverse possession under state statute, than to land held for other governmental purposes.

The point is made that irrespective of the statutes as to adverse possession, the assertion of this claim on behalf of the Indians is precluded by Section 429 of the North Carolina Code, which provides that no action for the recovery or possession of real property shall be maintained, unless it appears that the plaintiff, or those under whom he claims, was seized or possessed of the premises in question within twenty years before the commencement of the action, unless he was under the disabilities prescribed by law. But since the adverse possession relied upon by the Power Company could not operate to divest the title held for the Indians, the rule applies that constructive possession follows title; and title was in those claiming under the Thomas grant. In addition to this, the rule is well settled that "state statutes of limitation neither bind nor have any application to the United States, when suing to enforce a public right or to protect interests of its Indian wards." United States v. Minnesota, 270 U.S. 181, 196, 46 S.Ct. 298, 301, 70 L.Ed. 539.

For the reasons stated, we are of opinion that the title to the land in controversy was in the United States as trustee for the Indians and that verdict should have been directed accordingly. The judgment appealed from will accordingly be reversed.

Reversed.